**UNITED STATES of America, Appellee,**

v.

**Lawrence E. PALMER, Appellant.**

No. 79–1282.

United States Court of Appeals, Eighth Circuit.

Submitted June 11, 1979.

Decided July 26, 1979.

T. Scott Richardson of Richardson & Carnasiotis, St. Louis, Mo., for appellant.

David V. Capes, Asst. U. S. Atty., St. Louis, Mo., for appellee; Robert D. Kingsland, U. S. Atty., St. Louis, Mo., on the brief.

Before HEANEY and STEPHENSON, Circuit Judges, and MARKEY,* Chief Judge.

* The Honorable Howard T. Markey, Chief Judge, United States Court of Customs and Patent Appeals, sitting by designation.

STEPHENSON, Circuit Judge.

Defendant Lawrence E. Palmer appeals his conviction [1] of being in possession of a firearm after having been convicted of a felony in violation of 18 U.S.C. § 1202(a)(1) (Appendix). Appellant contends that the stop and search which resulted in the seizure of his firearm was an unconstitutional violation of his Fourth Amendment rights. Because the circumstances do not justify a reasonable suspicion on the part of the police officer that appellant was involved in criminal activity and also because there is no indication that appellant was stopped pursuant to a plan detailing neutral limitations on the conduct of individual officers, we hold that the stop and search was illegal and therefore reverse the conviction.

Before St. Louis County Police Officer Gary T. Lottmann commenced his evening patrol on October 20, 1977, he was informed that a racial incident had occurred at Riverview Gardens High School and that it would continue into Castle Point, the high crime, racially mixed, residential area that he would be patrolling. Lottmann had been on the police force approximately one year and had previously patrolled this area. Officer Lottmann was instructed to intensify his patrol so that people in the neighborhood would realize that the police were circulating in order to hold down possible conflicts. He was also instructed to discover the reasons for any street fights and to talk to the parents of the youths involved in any fights so that the combatants would be discouraged from continued fighting. One way in which Officer Lottmann intensified his patrol was by making pedestrian stops during which he filled out a field interview report form. This report consists of the pedestrian's name, address, date of birth, all relevant identification, driver's license, physical and clothing descriptions, and the place and time the pedestrian was stopped.

Between 4:00 p. m. and 7:00 p. m. Officer Lottmann broke up three fights between white and black Castle Point youths. No arrests were made, but Officer Lottmann recorded the names and addresses of the youths. Lottmann was informed by the combatants, their parents, and some spectators that they were arming themselves for their own protection because they were not going to be assaulted without having a means of retaliation. He also learned that a gang in the neighborhood was looking for a 5'7" black, male teenager in connection with the assault of a white female which had occurred at the Riverview Gardens High School earlier in the day.

At approximately 9:00 p. m. Officer Lottmann observed appellant Palmer and Sherman Burks walking down a residential street. Lottmann stopped his police car, got out, waved his hand and called for them to come over towards the car. Lottmann's stated purpose for the stop was to fill out field interview reports and also to ask if Palmer and Burks were aware of any upcoming gang fights. Appellant Palmer walked towards the policeman but Burks walked at an angle where he maintained his distance away from the officer. Officer Lottmann called to Burks a second time, and as Burks came over Lottmann observed that he appeared nervous and had his left hand in his coat pocket. When asked for identification, Burks told Lottmann his name, but began stuttering and fidgeting.

When Officer Lottmann stepped forward Burks jerked back, so Lottmann grabbed Burks' right coat pocket. The officer felt a hard object, reached inside and found a pocketknife. Burks jerked again and Lottmann grabbed the left coat pocket. Lottmann felt Burks' hand and another hard object, reached inside and retrieved a gun. Lottmann then arrested Burks for carrying a concealed weapon. Turning to appellant Palmer, who had been standing still during this sequence of events, Officer Lottmann asked him to place his hands on the car. Lottmann conducted a patdown search of appellant and discovered a .45 automatic in

1. The Honorable H. Kenneth Wangelin, United States District Judge for the Eastern District of Missouri.

the small of his back. Appellant was then arrested for carrying a concealed weapon.

Prior to trial Palmer filed a motion to suppress the firearm as evidence on the grounds that it had been unlawfully seized in violation of his rights under the Fourth Amendment. The matter was referred to a United States magistrate, who held hearings on the motion on March 2 and 8, 1979. Officer Lottmann was the only witness during these hearings. The magistrate recommended that Palmer's motion to suppress evidence be denied.[2]

The United States and Palmer submitted a written stipulation that the case be tried upon their stipulated facts and upon the transcript of the March suppression hearings. In the stipulation Palmer reserved his right to appeal any judgment which denied his motion to suppress the firearm as evidence. The district court denied Palmer's motion to suppress evidence,[3] found him guilty, and sentenced him to eighteen months confinement. Palmer now comes before this court contending that he was subjected to an unreasonable search and seizure. The thrust of Palmer's argument in this appeal is that the initial stop was unreasonable.

The difficult questions before this court are:

(1) Whether the racial tension and related incidents preceding this on-the-street encounter justified the officer's intrusion upon appellant's right to personal security.

(2) Whether the officer stopped appellant pursuant to a plan which circumscribed the officer's discretion by placing explicit, neutral limitations on

his conduct. *See Brown v. Texas,* —— U.S. ——, ——, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979).

Appellant Palmer and Burks were protected by the Fourth Amendment's proscription against unreasonable search and seizure as they walked down the street in Castle Point. *Terry v. Ohio,* 392 U.S. 1, 9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1967). In *Terry* the Supreme Court ruled that a dual inquiry is necessary in determining whether a warrantless search and seizure are unreasonable. Therefore, we must consider "whether the officer's action was justified at its inception," and secondly, "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 19, 20, 88 S.Ct. at 1879. Appellant does not contend that Officer Lottmann's actions were unreasonably related in scope to the circumstances, but argues on appeal that the officer's action in stopping him was unjustified.

When Officer Lottmann stopped appellant for the purposes of obtaining identification and of soliciting information about gang fights, he performed a seizure subject to the reasonableness requirement of the Fourth Amendment. "[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Id.* at 16, 88 S.Ct. at 1877; *United States v. Wright,* 565 F.2d 486, 488 (8th Cir. 1977), *cert. denied,* 435 U.S. 974, 98 S.Ct. 1621, 56 L.Ed.2d 67 (1978). A seizure may be accomplished either by physical restraint or by sufficient show of authority. *Terry v. Ohio, supra,* 392 U.S. at 19 n. 16, 88 S.Ct. 1868. The *Terry* seizure requirement is fulfilled when "it is apparent from the

---

2. The magistrate rejected appellant's contention that dismissal of a state charge of carrying a concealed weapon because his firearm was unlawfully seized should bind the magistrate's determination in the instant action under the doctrine of res judicata or collateral estoppel. *See Turley v. Wyrick,* 554 F.2d 840 (8th Cir. 1977), *cert. denied,* 434 U.S. 1033, 98 S.Ct. 765, 54 L.Ed.2d 780 (1978); *United States v. Culotta,* 413 F.2d 1343, 1345 (2d Cir. 1969), *cert. denied,* 396 U.S. 1019, 90 S.Ct. 568, 24 L.Ed.2d 510 (1970). Appellant does not contest this ruling in the instant appeal.

3. The district court concluded, *inter alia:* "The initial act of the officer in directing the defendant and his companion to approach for the purpose of identification was a very limited and reasonable intrusion into their Fourth Amendment rights, given the recent disturbances in the neighborhood. *United States v. Brignoni-Ponce,* 422 U.S. 873, 884–85, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *United States v. Martinez-Fuerte,* 428 U.S. 543, 556–64, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976)."

circumstances that the individual was not free to ignore the officer and proceed on his way." *United States v. Pope,* 561 F.2d 663, 668 (6th Cir. 1977). Officer Lottmann stopped his car, got out, then motioned and called for appellant and his companion Burks to walk across the street towards him. Burks did not walk towards the car in compliance with the command [4] so Lottmann called a second time, which indicates that the pair were not free to continue down the street. Clearly Lottmann's actions constituted a sufficient show of authority to restrain appellant's freedom of movement, therefore appellant was seized.

In determining whether this seizure has complied with the reasonableness requirement of the Fourth Amendment, we must balance the public interest against the appellant's competing interest of being free from arbitrary interference by law officers. *Brown v. Texas, supra,* —— U.S. at ——, ——, 99 S.Ct. 2637; *United States v. Brignoni-Ponce,* 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). In this balancing process we follow the standards laid down by the Supreme Court in *Brown v. Texas, supra,* —— U.S. at ——, 99 S.Ct. at 2640:

A central concern in balancing these competing considerations in a variety of settings has been to assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field. * * * To this end, the Fourth Amendment requires that a seizure must be based on specific, objective facts indicating that society's legitimate interests require the seizure of the particular individual, or that the seizure must be carried out pursuant to a plan embody-

ing explicit, neutral limitations on the conduct of individual officers.

*Id.* (citations omitted).

■ First we consider whether Officer Lottmann possessed specific, objective facts which indicated that the initial seizure of appellant Palmer was justified. In his testimony before the United States magistrate, Lottmann identified certain facts which he knew prior to the stop and upon which he based his authority to stop appellant and his companion. These facts are:

(1) He would be patrolling alone in a high crime area.

(2) A racial incident in which a black youth had assaulted a white female had occurred at a local high school earlier that same day prior to Lottmann going on duty.

(3) Racial unrest was expected to carry over into the residential area he would be patrolling, therefore his patrol was to be intensified.

(4) During his patrol he broke up three street fights between white and black youths.

(5) He was informed by residents that people were arming themselves for protection with a gun, knife, or a bat with nails in it.

(6) He also learned that a gang was looking for a 5'7" black, male teenager in connection with the high school assault.

The facts clearly reveal general racial unrest and the rumors of possible gang action indicate that further trouble could reasonably be anticipated. However, generalized racial unrest [5] cannot obviate the

---

**4.** Lottmann testified, "From the tone of voice I used, I would say Mr. Burks heard me."

**5.** Nine o'clock p. m. was a reasonable hour for pedestrians to be on the street and it would not be unusual to see black pedestrians in an integrated neighborhood. Officer Lottmann was not investigating any particular crime and there is no showing that he had been informed of suspicious activities occurring in the street area where Palmer and Burks were walking. He only possessed a general knowledge that some racial tension existed. *See United States*

*v. Nicholas,* 448 F.2d 622, 624 (8th Cir. 1971). "[A]wareness of the unusual, and a proper resolve to keep a sharp eye, is not the same as an articulated suspicion of criminal conduct." *United States v. Montgomery,* 182 U.S.App. D.C. 426, 430, 561 F.2d 875, 879 (1977).

The existence of a high burglary rate in the hotels at Las Vegas is beside the point. [The deputies] had no reason to believe that a particular crime might be afoot, much less that [appellant] might be involved. A high rate of burglary in Las Vegas hotels is not surprising and may call for vigilant surveil-

requirement that law officers "have a reasonable suspicion, based on objective facts, that the individual [seized] is involved in criminal activity." *Brown v. Texas, supra,* —— U.S. at ——, 99 S.Ct. at 2641. *See Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660 (1979); *United States v. Brignoni-Ponce, supra,* 422 U.S. at 882–883, 95 S.Ct. 2574; *United States v. Nicholas,* 448 F.2d 622 (8th Cir. 1971). Officer Lottmann testified that he was not looking for a suspect in connection with a recent robbery or burglary[6], and that he did not suspect appellant or Burks of casing a house for a possible burglary when he stopped them. Further, Lottmann testified that appellant and Burks were not acting suspiciously in any manner and that he did not suspect them of having committed any criminal activity. At one point Lottmann indicated that he thought appellant could possibly have been a high school student. However, in later testimony Lottmann revealed that when he made the stop, he did not suspect appellant or Burks of being involved in the high school racial incident. Lottmann's testimony demonstrates that not only did he lack "a reasonable suspicion" that appellant was involved in criminal activity, he actually had no suspicion whatsoever that appellant or Burks was involved in criminal activity.

We recognize that Officer Lottmann's stop was an attempt to further the social objective of crime prevention. However, the balance tips in favor of freedom from police interference when there is no articulable basis for suspecting appellant Palmer of involvement in criminal activity. "[E]ven assuming that [crime prevention] is served to some degree by stopping and demanding identification from an individual without any specific basis for believing he is involved in criminal activity, the guarantees of the Fourth Amendment do not allow it.

When such a stop is not based on objective criteria, the risk of arbitrary and abusive police practices exceeds tolerable limits. *See Delaware v. Prouse, supra,* [99 S.Ct. at 1400]." *Brown v. Texas, supra,* —— U.S. at ——, 99 S.Ct. at 2641.

■ Secondly, we consider whether Officer Lottmann was acting pursuant to a plan incorporating explicit, neutral limitations on his conduct. Although this issue was not argued by the parties, Officer Lottmann did give testimony relevant to the issue at the hearings before the magistrate.

Lottmann testified that his supervisor on October 20, 1977, Lieutenant Benoise, had told him to intensify his patrol in the area. Additional testimony revealed that Lottmann himself had made the decision that the way he would intensify the patrol would be by filling out field interview reports (FIRS). Lottmann indicated that he had completed five, possibly ten, FIRS before the time he stopped appellant and Burks.

When questioned as to the guidelines officers use in filling out FIRS, Lottmann specified two guidelines. First, officers do a canvas of an area where a serious crime such as burglary, armed robbery, or homicide has been committed. Officers fill out an FIR on people in the area so that detectives can do follow-up interviews to obtain undisclosed information. Secondly, FIRS are completed on people whom the officer's radio channel has reported to be a person of noteworthy interest. These people have been specified as noteworthy either by a federal agency or by the officer's department in that the whereabouts of this particular person is desired information.

Further, Lottmann testified that there is no regulation describing whether an officer should make a request, or direct, or order a person to stop and give the desired informa-

---

lance, but it cannot justify a relaxed application of the Fourth Amendment in and around the casinos.
*Schulz v. Lamb,* 504 F.2d 1009, 1011 (9th Cir. 1974).

6. We do not here limit the police officer's authority to make a lawful investigatory inquiry in the aftermath of a specific crime. In that situation it is necessary to obtain information from people in the area who might have made observations that would be helpful in apprehending the particular criminal involved.

tion. At the March 8 hearing Lottmann did, however, detail the procedure he used in his past experiences of conducting FIRS:

> I stop the car, get out and approach them and they approach me. And then I interview them, fill out the FIR and explain why I'm filling it out and what information is on there. And then if the person has any outside statements that aren't contained on that field interview report,[7] I discuss it with them, then we go on our way.

Lottmann also explained that based on his understanding of the directives on conducting FIRS, if he encountered a situation where the pedestrian continued walking at an average pace, he would ask them to stop. Lottmann's conduct after this point would depend on the pedestrian's actions. If the pedestrian started walking on private property, for example on or through a yard, Lottmann would stop the pedestrian to ask if that was his residence. If the pedestrian became belligerent or refused to answer a question, Lottmann felt that would indicate there was a reason for the refusal. Lottmann further indicated the reason could be a past criminal act or that the person was wanted by the police, therefore refusing to give his name would show that he would eventually be arrested. Lottmann went on to state that he had never had someone say no.

Lottmann's testimony clearly reveals that he was not acting pursuant to any specified plan. He was not told to make any FIRS, but used his own discretion in selecting that method as a means of intensifying his patrol. In addition, Lottmann was not following the two specific guidelines he described. He had not received a radio report indicating that a black male resembling appellant or Burks was a person of noteworthy interest. Likewise, he lacked knowledge of any serious crime committed in the area necessitating a canvas which might include gathering information from pedestrians. Lottmann was aware of three fights between black and white youths. In two of the fights the combatants were twelve and thirteen, and in the third fight the range was from nine to seventeen. The fact that Lottmann did not make any arrests in connection with these fights emphasizes the difference between this type of activity and a recent homicide or armed robbery, activities which might reasonably warrant an area canvas.

It is also apparent that Lottmann was unable to specify any "explicit, neutral limitations" on his conduct. Lottmann hypothesized what his reactions would be in various situations based on his understanding of department directives, but did not clearly identify directives which explicitly limited his conduct. In fact, he indicated that he had discretion to choose between making a request or directing or even ordering a pedestrian to stop.

In the recent case of *Delaware v. Prouse, supra,* 99 S.Ct. at 1400, the Supreme Court determined that random auto stops are violative of the Fourth Amendment. The Court felt that "[t]o insist upon neither an appropriate factual basis for suspicion directed at a particular automobile nor upon some other substantial and objective standard or rule to govern the exercise of discretion 'would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches * * *'." *Id. quoting from Terry v. Ohio, supra,* 392 U.S. at 22, 88 S.Ct. 1868. The discretion of the officer in the field must be circumscribed to prevent standardless and unconstrained discretion. *Delaware v. Prouse, supra,* 99 S.Ct. at 1400. These same considerations make random pedestrian stops undertaken at the unfettered discretion of Officer Lottmann violative of the Fourth Amendment.

Because we have decided that Officer Lottmann's action was unjustified at its inception, we need not consider the second prong of the *Terry* analysis, whether the action was permissible in scope.

---

7. The field interview report contains the person's name, address, date of birth, all relevant identification, driver's license, physical and clothing descriptions, and the place and time of the stop.

We hold that the district court erred in denying Palmer's motion to suppress evidence. Further, this error requires reversal of his conviction. Without the firearm, the government would obviously have no evidence to convict Palmer of being a felon in possession of a firearm. The judgment of conviction is therefore reversed and the case is remanded for further proceedings.