# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-3229

_____

Norris Perry

*Plaintiff - Appellee*

v.

Woodruff County Sheriff Department, By and through Stacy Barker and Freddie
Hudson; Stacy Barker; Freddie Hudson, In His Individual and Official Capacity;
McCroy Police Department; James R. Jackson; McCroy, City of; Doyle Fowler,
McCroy Mayor, In His Individual and Official Capacity; Charles Dallas, Woodruff
County Judge, In His Individual and Official Capacity; Woodruff County,
Arkansas; Rowland Clark, Deputy Sheriff, In His Individual and Official Capacity

*Defendant*s

Margo Wolfe, Police Officer, In Her Individual and Official Capacity

*Defendant - Appellant*

Bruce Golden, Sheriff's Deputy/Police Officer, Individually and in His Official
Capacity; Clark, LT, Individually and in His/Her Official Capacity; John Does, 1 -
5, Individually and in their Official Capacity

*Defendant*s

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Helena

_____

Submitted: April 7, 2017
Filed: June 5, 2017

_____

Before GRUENDER, MURPHY, and KELLY, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Norris Perry sued multiple defendants employed by Woodruff County, Arkansas and the City of McCrory for an arrest that occurred on August 30, 2009. Perry alleged excessive-force, illegal-arrest, and illegal-search claims under 42 U.S.C. § 1983 and related tort claims under Arkansas law. The district court[1] denied summary judgment to a number of defendants who took part in the incident, including City of McCrory Police Officer Margo Wolfe. Wolfe appealed, claiming that the district court erred when it concluded that she was not entitled to qualified immunity. For the reasons discussed below, we affirm.

## I. BACKGROUND

On the night of August 30, 2009, Perry drove to his local carwash to clean his truck. Wolfe, who was off-duty and at her apartment, saw Perry from her back steps and called dispatch to investigate, as she believed that he was acting suspiciously. Woodruff County Deputy Sheriff Bruce Golden responded, arrived at the carwash, and parked behind Perry's truck. Perry approached Golden and asked if everything was alright. When Golden responded affirmatively, Perry returned to cleaning his truck. As Perry prepared to leave the carwash, Golden approached and asked Perry for his license and registration. Perry obliged without incident, and Golden checked for outstanding warrants. After finding no outstanding warrants, Golden returned Perry's documents but directed him to wait to talk with another officer. Perry questioned Golden about why another officer needed to talk to him but complied with the order.

_____

[1]The Honorable Brian S. Miller, Chief Judge, United States District Court for the Eastern District of Arkansas.

Shortly thereafter, City of McCrory Police Lieutenant Booker Pennington, Woodruff County Deputy Sheriff Rowland Clark, and Wolfe arrived on scene. Clark asked Golden if he had searched Perry for weapons. Golden conducted a pat-down and recovered a multi-tool knife in Perry's possession. Clark then approached Perry and instructed him to "spread eagle" for another pat-down. Perry complied but questioned the justification for the search. Perry testified that he did not act aggressively towards Clark or threaten Clark's safety. Perry also testified that, without any provocation, Clark stepped behind Perry, wrapped his arm around Perry's neck, lifted Perry off his feet, and knocked Perry to the ground, face first. Wolfe was twenty feet away, and she testified that she saw Perry turn in an aggressive manner as if he were about to swing at Clark. After witnessing Clark take Perry to the ground, she ran over, secured Perry's right hand, and forced her knee into his back to subdue him. Golden proceeded to handcuff Perry. Pennington, who was Wolfe's superior, told the other officers that Perry was not a threat, but when Pennington tried to remove the handcuffs, Clark stopped him and said that he had no authority to do so because "this [was] a county thing now." Perry testified that throughout the episode, he cried out for help and asked officers why he was being arrested but did not threaten the officers' safety or resist arrest. Perry was then charged with a number of crimes including possessing a weapon, resisting arrest, and disorderly conduct. All charges eventually were dismissed.

As a result of the incident, Perry suffered lacerated tendons in his knees, a bulged disc in his neck, constant back problems, nerve damage, and post-traumatic stress disorder. He brought this suit against Wolfe and other defendants, stating federal and state law claims. The district court denied summary judgment and allowed the majority of Perry's claims to proceed. Wolfe appealed, claiming that the district court erred in ruling that she was not entitled to qualified immunity.

## II. DISCUSSION

Under the collateral order doctrine, we have authority to hear an interlocutory appeal of a denial of qualified immunity. *Ehlers v. City of Rapid City*, 846 F.3d 1002, 1008 (8th Cir. 2017). We are limited, however, to reviewing questions of law, not factual disputes, and thus, "we review a district court's qualified immunity determination on summary judgment *de novo*, viewing the record in the light most favorable to the plaintiff and drawing all reasonable inferences in his favor." *Id.* (alterations and quotation omitted).

Qualified immunity protects law enforcement officers from liability for civil damages so long as their conduct does not violate clearly established constitutional or statutory rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). An officer loses the shield of qualified immunity if (1) the facts alleged, taken in the light most favorable to the plaintiff, show the officer's conduct violated a constitutional or statutory right; and (2) that right was clearly established at the time of the purported misconduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Ehlers*, 846 F.3d at 1008. A constitutional or statutory right is clearly established when the contours of the right are "sufficiently clear [such] that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). While "general statements of law are not inherently incapable of giving fair and clear warning to officers," *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quotation omitted), the Supreme Court has cautioned lower courts against defining clearly established rights "at a high level of generality," *see id.* (quotation omitted).

### A. Fourth Amendment Violation

First, we determine whether Wolfe's conduct violated Perry's Fourth Amendment right to be free from the use of excessive force. In determining whether a particular use of force was excessive, we consider whether it was objectively

reasonable under the circumstances, "rely[ing] on the perspective of a reasonable officer present at the scene rather than the '20/20 vision of hindsight.'" *Carpenter v. Gage*, 686 F.3d 644, 649 (8th Cir. 2012) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). The proper application of this standard "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

Viewing the evidence in the light most favorable to Perry, we conclude that the district court did not err in holding that Wolfe violated Perry's Fourth Amendment right to be free from excessive force because her use of force was objectively unreasonable as a matter of law. Perry did not commit any crimes on the night of August 30, 2009. While Perry questioned the justification for the pat-down and his subsequent arrest, he did not act aggressively or threaten Clark's safety. Instead, Clark threw Perry to the ground without provocation, and Wolfe viewed this entire interaction before assisting in subduing Perry. At no time did Perry struggle, resist arrest, or threaten the safety of any of the officers. Wolfe's supervisor, Pennington, even attempted to prevent the arrest and remove Perry's handcuffs because he believed that Perry was not a threat. In similar circumstances, we denied qualified immunity to an officer who assisted in subduing and handcuffing a non-resisting plaintiff because the assisting officer "was present for the entire encounter and saw that [the] plaintiff—wearing only a bathrobe—posed no threat to the safety of the officers or others and did not attempt to resist arrest." *Smith v. Kansas City Police Dep't*, 586 F.3d 576, 582 (8th Cir. 2009). These facts are analogous to the present case and demonstrate that Wolfe's actions restraining Perry's arm and forcing her knee into his back violated his Fourth Amendment right to be free from excessive force.

Wolfe argues that she is entitled to qualified immunity because she merely heard a scuffle between Perry and Clark before coming to Clark's aid. In these

circumstances, she claims, it was entirely reasonable for her to fear for Clark's safety and use force against Perry. Unfortunately for Wolfe, the record does not support her contention. To the contrary, Wolfe testified that she witnessed the entire interaction between Clark and Perry. Viewing the facts in the light most favorable to Perry then compels us to credit Perry's allegations that he was not threatening Clark's safety or otherwise resisting arrest. Thus, the record demonstrates that Wolfe observed the entire encounter and understood that Perry did not pose a threat to Clark or other officers. As a result, Wolfe cannot claim that it was reasonable for her to restrain Perry's arm and force her knee into his back.[2] *See id.* We therefore conclude that Wolfe's actions constituted a Fourth Amendment violation because she joined Clark's excessive use of force even when she knew that Perry did not commit a crime, threaten Clark's safety, or resist arrest.[3]

## B. Clearly Established Law

Next, we assess whether Perry's right to be free from the use of excessive force was clearly established in August 2009, the date of the incident. In *Smith*, we found that, by 2006, it was clearly established that an assisting officer who knew that a suspect was not resisting or threatening the officers violated that suspect's Fourth Amendment rights by subduing and handcuffing him. *See* 586 F.3d at 582. Thus, it follows that at the time of the incident here, Perry's Fourth Amendment right to be free from excessive force was also clearly established.

---

[2]We acknowledge that different factual circumstances could lead to a different conclusion, even if a suspect were not resisting arrest or otherwise acting in a way warranting the use of force. *See, e.g.*, *Ehlers*, 846 F.3d at 1010 (listing cases where an assisting officer is entitled to rely on the probable cause determination of an arresting officer). If Wolfe had only heard a scuffle and then turned to see Clark struggling with Perry, qualified immunity may well be appropriate. Wolfe testified, however, that she was present for and viewed the entire incident.

[3]The district court denied Clark qualified immunity, and he did not appeal the district court's decision.

Wolfe raises a two-fold challenge to our conclusion about the clearly established nature of the Fourth Amendment violation. She first claims that under *White v. Pauly*, 137 S. Ct. 548 (2017), it was not clearly established that she was prohibited from relying on Clark's judgments about the need to use force against Perry. Next, she asserts that Perry's claim founders on *Chambers v. Pennycook*, 641 F.3d 898 (8th Cir. 2011), because Perry only alleged *de minimis* injuries and under *Pennycook*, such injuries could not serve as the basis for excessive-force claims until 2011. Both her arguments are unavailing.

In *White*, the Supreme Court held that "[c]learly established federal law does not prohibit a reasonable officer who arrives late to an ongoing police action . . . from assuming that proper procedures . . . have already been followed. No settled Fourth Amendment principle requires that officer to second-guess the earlier steps already taken by his or her fellow officers." 137 S. Ct. at 552. *White* is inapplicable to our case because it addresses a wholly different set of facts. As noted above, Wolfe was on the scene at the time of the incident and testified that she viewed the entire interaction between Perry and Clark. As a result, *Smith* governs this case, and Perry's Fourth Amendment right to be free from excessive force was clearly established.

Wolfe responds that even if she used excessive force against Perry, he suffered only *de minimis* injuries as a result of her conduct. In *Pennycook*, decided in 2011, we held for the first time "that a citizen may prove an unreasonable seizure based on an excessive use of force without necessarily showing more than *de minimis* injury." 641 F.3d at 901. While it is true that a *de minimis* injury could not serve as the basis for an excessive-force claim in August 2009, the record indicates that Perry suffered more than *de minimis* injuries such that *Pennycook* does not apply.

During his deposition testimony, Perry noted that as a result of the incident, he suffered lacerated tendons in his knee, a bulged disc in the neck, constant back problems, nerve damage, and post-traumatic stress disorder. Perry also testified that when Wolfe restrained him and placed her knee in the middle of his back, he felt a

sharp pain in his back and ribs. In a subsequent affidavit, Perry further explained that his injuries were collectively caused by "the forced take-down by Rowland Clark, assisted by Margo Wolfe and Bruce Golden." Wolfe asserts, however, that Perry's affidavit directly contradicts his earlier deposition testimony because his deposition testimony suggests that Wolfe only caused *de minimis* injuries while his affidavit alleges more serious injuries. Therefore, Wolfe contends the later affidavit constitutes a forbidden attempt to manufacture a "sham issue of fact." *Herring v. Can. Life Assurance Co.*, 207 F.3d 1026, 1030 (8th Cir. 2000) (quotation omitted). We disagree.

Viewing the record in a light most favorable to Perry suggests that the affidavit was a clarification or explanation of the prior testimony and not a direct contradiction. *See id.* at 1030-31 ("[T]here are narrow circumstances in which a subsequent affidavit is appropriate, such as to explain certain aspects of the deposition testimony or where the prior testimony reflects confusion on the part of the witness." (quotation omitted)). More importantly, however, insofar as there is any inconsistency between Perry's deposition testimony and his later affidavit, our precedents dictate that this constitutes a genuine issue of material fact. *Id.* at 1031 (citing *Kim v. Ingersoll Rand Co.*, 921 F.2d 197, 199 (8th Cir. 1990) (apparent discrepancy in plaintiff's trial testimony and his earlier deposition testimony created a credibility question for the jury)). As a result, viewing the record in the light most favorable to Perry, the injuries he suffered were more serious than *de minimis* ones. Accordingly, *Pennycook* does not control this case, and we conclude that Perry's Fourth Amendment right to be free from excessive force was clearly established in August 2009 such that Wolfe was not entitled to qualified immunity.

### III. CONCLUSION

We affirm the district court's denial of Wolfe's motion for summary judgment.

_____