# United States Court of Appeals
## For the Eighth Circuit

_____

No. 18-1324

_____

Gregory Clark

*Plaintiff - Appellant*

v.

Austin Clark, Deputy, in his individual capacity only

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Missouri - Cape Girardeau

_____

Submitted: January 17, 2019
Filed: June 13, 2019

_____

Before SMITH, Chief Judge, COLLOTON, and ERICKSON, Circuit Judges.

_____

ERICKSON, Circuit Judge.

On January 25, 2016, Ste. Genevieve County Deputies Austin Clark ("Deputy Clark") and Matthew Ballew responded to a 9-1-1 report of gunshots from the vicinity of a rest area. When they arrived at the rest stop to investigate, the officers encountered Gregory Clark ("Gregory") seated at a table adjacent to the building. After calling in Gregory's identification, a brief, somewhat adversarial discussion

about Gregory's race ensued. Gregory drove away in his vehicle after the officers went inside the building to continue their investigation. The officers then followed Gregory for approximately 19 miles on the highway, at which point Gregory stopped his vehicle on an exit ramp. After further discussion and investigation, Gregory was allowed to leave. Gregory filed this action against Deputy Clark, alleging constitutional violations under the First Amendment, Fourth Amendment, and the Equal Protection Clause of the Fourteenth Amendment. The district court[1] granted summary judgment in favor of Deputy Clark on all claims on the basis of qualified immunity. We affirm.

## I. Background

On the afternoon of January 25, 2016, the principal of Bloomsdale Elementary School called 9-1-1 and reported gunshots coming from the direction of the nearby woods. Approximately 12-15 minutes later, Ste. Genevieve County Deputies Clark and Ballew arrived at a rest area located about 150 yards from the school.

Appellant Gregory Clark was the only person at the rest area at the time. Gregory was talking on his phone at a table when Deputy Clark and another officer approached him (not in uniform, but with badges and sidearms). Assuming they were police officers, Gregory voluntarily handed the officers his driver's license, his retired military identification, and his concealed carry permit. Gregory informed the officers that he was armed. The officers asked Gregory whether he had heard "anything" or any "gunfire." Gregory said that he had not. The officers then asked Gregory where he was going. He responded that he was on his way to Chicago. Deputy Clark ran Gregory's identification, which came back clean. When Gregory inquired as to the reason his information had been run, Deputy Clark replied that his "boss likes to

---

[1]The Honorable Audrey G. Fleissig, United States District Judge for the Eastern District of Missouri.

know who he is talking to." Gregory followed up by asking if "[Deputy Clark would] have done that to anyone else." Gregory admits that his question was directed at whether he was being subjected to racial profiling. Deputy Clark responded angrily by saying "don't play the race card with me." Without any further discussion, Deputy Clark handed the three cards back to Gregory and ended the encounter.

The police officers searched for a suspect inside the building, but found no one. When they came back out of the building, they saw Gregory driving away. The officers followed him onto the highway heading northbound toward Chicago. Gregory noticed the officers following him. He made a U-turn about two miles later, trying to avoid them because he "didn't know what could happen" and "was in fear of [his] life." The officers continued to follow Gregory.

As the officers were following Gregory, Deputy Clark observed Gregory making "exaggerated movements," leaning toward the passenger seat and center console. Because Gregory's vehicle had heavily tinted rear windows, it was difficult to see exactly what Gregory was doing inside the car. After driving approximately three to five more miles, Gregory spotted several more police cars in the area so he turned on his hazard lights and pulled off the highway onto an exit ramp.

After stopping his vehicle, Gregory put both hands outside the driver's side window. Deputy Clark and two other officers approached the vehicle with guns drawn in the "low ready" position. Deputy Clark then raised his gun and ordered Gregory out of the vehicle. Gregory complied. Deputy Clark patted Gregory down and another officer moved him away from the vehicle. Deputy Clark began searching inside the vehicle. Gregory told Deputy Clark that the gun he had told them about at the rest area was in the center console. When Deputy Clark retrieved the gun, he noticed it was cold and missing two bullets.

Deputy Clark questioned Gregory about why the gun was missing two bullets. Gregory indicated that he had not fired the weapon in years and could not explain the two missing rounds. During this conversation, another officer examined the gun and verified that it had not been fired recently. The gun's serial number was run by dispatch. When it came back as stolen, Gregory was handcuffed. Further inquiry revealed that Gregory was the person who had mistakenly reported the gun as stolen when he had merely misplaced it, at which point the officers remaining at the scene removed the handcuffs, returned Gregory's gun and told Gregory he was free to leave.

Gregory sued Deputy Clark, alleging: (1) he was unlawfully seized when Deputy Clark detained him at the rest area while running his identification; (2) a second unlawful seizure occurred when Deputy Clark detained him on the highway; (3) Deputy Clark used excessive force when he pointed his gun after he voluntarily pulled over; (4) the vehicle search was unconstitutional; (5) the theft of two bullets constituted a substantive due process violation; (6) the entire detention and inquiry at the rest area was based solely on race and violated the equal protection clause; and (7) the entire course of events that took place after inquiring whether he was being singled out because of his race was in retaliation for exercising his First Amendment rights. Deputy Clark successfully moved for summary judgment on all counts. Gregory now appeals the district court's ruling on claims (1), (2), (3), (6) and (7).

## II. Discussion

We review the grant of summary judgment on the basis of qualified immunity *de novo*, viewing the evidence in the light most favorable to the nonmoving party. Peterson v. Kopp, 754 F.3d 594, 598 (8th Cir. 2014). Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).

"[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018) (internal quotation marks omitted). "For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what [the official] is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Hope v. Pelzer, 536 U.S. 730, 739 (2002) (internal citation omitted) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). See also Malley v. Briggs, 475 U.S. 335, 341 (1986) ("[Qualified immunity] provides ample protection to all but the plainly incompetent or those who knowingly violate the law.").

For Gregory to establish a § 1983 claim for a Fourth Amendment violation, he must demonstrate a search or seizure occurred, and the search or seizure was unreasonable. McCoy v. City of Monticello, 342 F.3d 842, 846 (8th Cir. 2003) (citing Hawkins v. City of Farmington, 189 F.3d 695, 702 (8th Cir. 1999)). "Reasonableness of a seizure is determined by the totality of the circumstances and must be judged from the viewpoint of a reasonable officer on the scene, irrespective of the officer's underlying intent or motivation." Id. at 848 (citations omitted). If an officer has reasonable suspicion that a crime has occurred and a subject has committed it, the officer may detain the subject while the officer investigates that crime. Terry v. Ohio, 392 U.S. 1, 24 (1968).

*A.  Initial Encounter*

The initial encounter at the rest stop presents no colorable claim that Gregory's Fourth Amendment rights were violated. "[C]onsensual communications between

officers and citizens[ ] involv[e] no coercion or restraint of liberty." Warren v. City of Lincoln, Neb., 864 F.2d 1436, 1438 (8th Cir. 1989). A consensual encounter between an officer and a citizen does not trigger the Fourth Amendment. United States v. Stewart, 631 F.3d 453, 456 (8th Cir. 2011) (citing Florida v. Bostick, 501 U.S. 429, 434 (1991)). Here, a consensual encounter began with Gregory handing over his identification cards without being asked to do so. This inferred consent was never explicitly revoked. Gregory never gave the officers reason to believe that he no longer wished to engage in the contact. Gregory never asked for the return of his identification cards or whether he could leave. Gregory has not pointed to any physical restraint, blocking action, or other show of authority that would indicate he was not free to leave. Instead, Gregory urges us to find he was detained based upon Deputy Clark's hostility and angry tone in stating "don't play the race card with me." This alleged hostility occurred after Deputy Clark had handed back Gregory's identification cards. Given the timing of when the statement was made–it was the officer's parting words–it is of little weight when analyzing the totality of the circumstances surrounding the encounter. Because the entire interaction was consensual, there was no seizure.

Even if we assume *arguendo* that the encounter was not consensual, the officers had a sufficient reasonable and articulable suspicion that warranted the intrusion. While a person's mere presence in a suspicious location does not, in and of itself, justify a Terry stop, Johnson v. Phillips, 664 F.3d 232, 237 (8th Cir. 2011), the court is to "determine whether the facts *collectively* provide a basis for reasonable suspicion." Stewart, 631 F.3d at 457. Here, the officers were aware that shots had been fired in the vicinity of the rest area. Gregory was the only person visible outside the rest area. Gregory volunteered that he had a permit to carry a gun and that he

actually had one in his possession.[2]  Taken in aggregate, these facts would give an objectively reasonable officer articulable suspicion to conduct a Terry stop.

### B.      Second Encounter

Although a number of facts surrounding the second highway encounter are disputed, Gregory acknowledged that a "detention did not occur when [he] first pulled over his car because he pulled over voluntarily." (Appellant's Br. 34).  The parties have debated extensively whether there was anything unusual about the manner or speed in which Gregory left the rest area, or whether there was excessive movement inside Gregory's truck while he was driving, or whether Deputy Clark had the ability to observe Gregory's movement inside the truck.  Because Deputy Clark did not conduct a traffic stop of Gregory's vehicle, these disputed issues are insignificant to the particular constitutional issue before us, and resolution of all of them in Gregory's favor would not establish a constitutional violation.  The disputed seizure implicating the Fourth Amendment occurred when officers, with guns drawn, ordered Gregory out of his car after he stopped voluntarily on the exit ramp.

To justify an investigative seizure under Terry v. Ohio, a "police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the intrusion.  392 U.S. at 21.  When Gregory stopped his vehicle, Deputy Clark knew Gregory had a firearm, but was unsure whether it had been fired recently.  After searching the building and grounds of the rest area and failing to find anyone else present, Deputy Clark had reason to follow up with Gregory about inspecting the gun that Gregory told him he had in his possession.  Gregory had informed the officers that he was traveling to Chicago, but

---

[2]The officers likely could have immediately completed their investigation of Gregory if they would have asked to inspect Gregory's gun at the rest area.  The fact that they did not do so, however, does not affect the reasonable suspicion analysis.

inexplicably made a U-turn in the opposite direction while being followed by police. Finally, Gregory pulled over and put his hands outside the driver's side window. While this is entirely consistent with Gregory's perspective that he was complying for his own safety, the act is also unusual and may be indicative of guilty conduct. At the time Gregory stopped his vehicle, police officers had reasonable and articulable suspicion that criminal activity might be afoot.

During the investigative seizure, Deputy Clark investigated the gun quickly and efficiently, and the period of detention lasted no longer than necessary to effectuate the investigation. While Gregory was handcuffed when the officers received information that the firearm had been reported stolen, they were removed as soon as the officers learned that Gregory was the person who had reported the firearm stolen. Handcuffing was a reasonable precaution and did not elevate the Terry stop to an arrest. United States v. Martinez, 462 F.3d 903, 908 (8th Cir. 2006). The seizure of Gregory on the highway exit ramp did not run afoul of the Fourth Amendment and was reasonably related in scope to the circumstances which justified the interference.

C.    Excessive Force

"The right to be free from excessive force in the context of an arrest is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures." Ngo v. Storlie, 495 F.3d 597, 604 (8th Cir. 2007) (quoting Samuelson v. City of New Ulm, 455 F.3d 871, 877 (8th Cir. 2006)). "In determining whether a particular use of force was excessive, we consider whether it was objectively reasonable under the circumstances, 'rely[ing] on the perspective of a reasonable officer present at the scene rather than the 20/20 vision of hindsight.'" Perry v. Woodruff County Sheriff Dept., 858 F.3d 1141, 1145 (8th Cir. 2017) (internal quotation marks omitted) (quoting Carpenter v. Gage, 686 F.3d 644, 649 (8th Cir. 2012)).

We have previously found police officers were entitled to qualified immunity when they pointed a gun at a suspect during a pursuit. See Edwards v. Giles, 51 F.3d 155 (8th Cir. 1995). In Edwards, we held that the pointing of a gun did not constitute an assertion of authority for Fourth Amendment purposes where the display did not cause the suspect to submit to the police officer's authority and, therefore, no seizure occurred. 51 F.3d at 157. Here, like in Edwards, Gregory submitted to Deputy Clark's authority before the gun was drawn.

Gregory relies on cases from this circuit and other circuits that have found that pointing a gun may constitute an unconstitutional display of force. E.g., Rochell v. City of Springdale Police Dep't, No. 17-3608, 2019 WL 1859237 (8th Cir. Apr. 25, 2019); Wilson v. Lamp, 901 F.3d 981 (8th Cir. 2018); Mlodzinski v. Lewis, 648 F.3d 24, 38 (1st Cir. 2011); Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1192-93 (10th Cir. 2001). Those cases are not analogous to the circumstances confronting the officers in this case. They involve incidents where guns were pointed at suspects for unreasonably long periods of time, well after the police had taken control of the situation. In this case, Gregory signaled compliance by putting his hands out the driver's side window. A reasonable officer was justified in believing the situation was not fully under control until Gregory had been removed from the vehicle, patted down, and restrained. When Gregory stopped his vehicle, officers knew Gregory had a weapon, were aware that he had been the only identified person present in an area where shots had reportedly been fired, and had reason to believe he might be a suspect attempting to evade capture. Under these circumstances, pointing a firearm at Gregory for a few seconds while removing him from his vehicle did not constitute excessive force, and did not violate the Fourth Amendment.

D. *Equal Protection*

To prove an equal protection claim in the context of a police interaction, Gregory must prove that the officer exercised his discretion to enforce a law solely

on the basis of race. Johnson v. Crooks, 326 F.3d 995, 999-1000 (8th Cir. 2003). This requires a showing of both discriminatory purpose and discriminatory effect. Id. (citing United States v. Armstrong, 517 U.S. 456, 465 (1996)). "[E]ncounters with officers may violate the Equal Protection Clause when initiated solely based on racial considerations." United States v. Frazier, 408 F.3d 1102, 1108 (8th Cir. 2005) (citing United States v. Woods, 213 F.3d 1021, 1022-23 (8th Cir. 2000)). "When the claim is selective enforcement of the traffic laws or a racially-motivated arrest, the plaintiff must normally prove that similarly situated individuals were not stopped or arrested in order to show the requisite discriminatory effect and purpose." Johnson, 326 F.3d at 1000 (citing Chavez v. Ill. State Police, 251 F.3d 612, 634-48 (7th Cir. 2001); Gardenhire v. Schubert, 205 F.3d 303, 319 (6th Cir. 2000)).

Gregory has not provided sufficient evidence to raise a fact question about whether he was singled out for investigation because of his race. He has presented no evidence to establish that similarly situated individuals were not stopped or investigated. He has not identified any "affirmative evidence from which a jury could find that [Gregory] has carried his . . . burden of proving the pertinent motive." Crawford-El v. Britton, 523 U.S. 574, 600 (1998) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256-57 (1986)). While the statement "don't play the race card with me" may have been hostile and unprofessional, it does not, alone, carry the burden of showing racial discrimination on Deputy Clark's part–particularly so when the alleged discriminatory acts are consistent with legitimate police work.

### E. First Amendment Retaliation

To properly state a claim for First Amendment retaliation, Gregory is required to show "a causal connection between a defendant's retaliatory animus and [his] subsequent injury." Osborne v. Grussing, 477 F.3d 1002, 1005 (8th Cir. 2007) (quoting Hartman v. Moore, 547 U.S. 250, 259 (2006)). As discussed above, the initial encounter was consensual and Deputy Clark had sufficient reasonable and

-10-

articulable suspicion to conduct an investigative seizure of Gregory. In light of Deputy Clark's legitimate motive to investigate, Clark has failed to draw the requisite causal connection to state a First Amendment retaliation claim.

## III. Conclusion

For the foregoing reasons, we affirm the district court's grant of summary judgment.

SMITH, Chief Judge, concurring.

I concur in the court's holding that the district court properly granted summary judgment in favor of Deputy Clark, as he lacked "fair notice" of his conduct's unlawfulness. *See Kisela v. Hughes*, 138 S. Ct. 1148, 1158 (2018) (per curiam) (explaining that qualified immunity protects officers lacking "fair notice" of their conduct's unconstitutionality). I write separately to express my disagreement with the court's conclusion that Deputy Clark had reasonable suspicion to stop Gregory after Gregory departed from the rest area. While Deputy Clark may have had reasonable suspicion to stop Gregory at the rest area had Gregory not consented to a search, that reasonable suspicion did not extend beyond that interaction.

"A seizure may be accomplished either by physical restraint or by sufficient show of authority. The *Terry* seizure requirement is fulfilled when it is apparent from the circumstances that the individual was not free to ignore the officer and proceed on his way." *United States v. Palmer*, 603 F.2d 1286, 1288–89 (8th Cir. 1979) (cleaned up).

> [I]n determining whether [a] seizure and search were unreasonable, this court looks at whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place. The search must be

strictly tied to and justified by the circumstances which rendered its initiation permissible.

*Wilson v. Lamp*, 901 F.3d 981, 986 (8th Cir. 2018) (cleaned up).

The court identifies (1) Deputy Clark knowing that Gregory had a gun and his desire to inspect that gun, (2) Gregory making a U-turn on the highway and, (3) Gregory pulling over and putting his hands out his truck's window as supporting Deputy Clark's reasonable suspicion.

However, Gregory's U-turn and surrender are particularly unsatisfactory bases for reasonable suspicion. By leaving Gregory without instructions to remain and moving to inspect the restrooms, Deputy Clark objectively indicated that the encounter had ended. Gregory left the rest area, reasonably believing his interaction with Deputy Clark had ended. Likewise, after the encounter had ended, Gregory could legitimately avoid further interactions with police. *See Florida v. Royer*, 460 U.S. 491, 498 (1983); *see also Illinois v. Wardlow*, 528 U.S. 119, 131 (2000) (Stevens, J., concurring in part and dissenting in part) (explaining that "[f]light to escape police detection . . . may have an entirely innocent motivation"). Nevertheless, Deputy Clark followed Gregory for 19 miles—including across an overpass after Gregory made a U-turn. Shortly after making the U-turn, Gregory noticed "police cars all over the area," Appellant's Br. at 12, and observed police cars "positioned" at an exit he was nearing, Mem. & Order at 3, *Gregory Clark v. Austin Clark*, No. 1:16-cv-00094-AGF (E.D. Mo. Jan. 23, 2018), ECF No. 62; *see also* Gregory Clark Depo. at 138, *Gregory Clark v. Austin Clark*, No. 1:16-cv-00094-AGF (E.D. Mo. Oct. 23, 2017), ECF No. 49-5 (testifying that he pulled over after observing police cars in front of him on the exit overpass while being followed by Deputy Clark). Afraid, and sensing from this "show of authority" that he "was not free to . . . proceed on his way," *Palmer*, 603 F.2d at 1289, Gregory eventually stopped at an exit. Many reasonable people traveling between states would be

unnerved by having local police follow and surround them on the highway. *See United States v. Peters*, 10 F.3d 1517, 1522 (10th Cir. 1993) (explaining that a nervous reaction to being followed and stared at by an officer after having already been searched and released was insufficient to support finding reasonable suspicion). This does not resemble a typical stop by police for a driving violation. Nervousness in this scenario could easily reflect a cautious consciousness of an imminent confrontation rather than a guilty conscience. Furthermore, "[r]easonable suspicion cannot be manufactured by the police themselves." *United States v. Yousif*, 308 F.3d 820, 829 (8th Cir. 2002).

Without Deputy Clark's interaction with Gregory at the rest area, Gregory would have been just another traveler. Therefore, for the stop at the exit to have been reasonable, the circumstances at the rest area must have "justified [Deputy Clark's] interference" with Clark, because a "search must be strictly tied to and justified by the circumstances which rendered its initiation permissible." *See Wilson*, 901 F.3d at 986 (internal quotations removed). While I agree that Deputy Clark likely had reasonable suspicion for a stop at the rest area, the question is close. Gregory was present near the crime scene, and, being armed, had had the ability to commit the crime. However, as the court notes, Gregory cooperated with police at the rest area, answering officers' questions and voluntarily providing them with his military identification and concealed carry permit. Furthermore, the caller from the school had not provided a description of the alleged shooter, and Gregory was not engaging in any suspicious activity when approached by Deputy Clark. *C.f. United States v. Quinn*, 812 F.3d 694 (8th Cir. 2016) (finding reasonable suspicion where suspect was not only one of the only people in proximity to the crime scene but also matched a description of the perpetrator and acted suspiciously when approached by police). Considering the closeness of the reasonable suspicion question at the rest stop, Deputy Clark's argument that Gregory's behavior on the highway augmented the suspicion he developed at the rest area is weak. Gregory's behavior on the highway was a natural reaction to being followed and surrounded by police, not behavior likely indicative

of a guilty conscience or criminal activity. With no relevant additional information to suggest that Gregory had in fact been the shooter at the rest area, Deputy Clark's decision to stop Gregory at the exit after following him for 19 miles was not "reasonably related in scope to the circumstances which justified the interference in the first place," or "strictly tied" to those circumstances. *See Wilson*, 901 F.3d at 986 (internal quotations omitted).

Neither does Deputy Clark's desire "to follow up with Gregory about inspecting the gun," justify the stop. *See supra* Part II.B. The Fourth Amendment's protections are not so easily undermined by second thoughts. *See United States v. Garcia*, 23 F.3d 1331, 1335–36 (8th Cir. 1994) (finding officer lacked reasonable suspicion for a second stop where officer released suspects after deciding not to hold them pending the arrival of backup).

Considering the totality of the circumstances, I conclude that Deputy Clark lacked reasonable suspicion for the exit stop and therefore violated Gregory's Fourth Amendment rights.

Nevertheless, that right was not established in a "particularized sense," as of January 2016. *See Mettler v. Whitledge*, 165 F.3d 1197, 1203 (8th Cir. 1999). For the reasons stated by the court in Part II.B. of this opinion, Deputy Clark could have reasonably believed that he had the authority to conduct the stop at the exit. Consequently, the district court properly granted summary judgment in Deputy Clark's favor.

_____