# United States Court of Appeals
## For the Eighth Circuit

_____

No. 20-1745
_____

Casondra Pollreis, on behalf of herself and
her minor children, W.Y. and S.Y.

*Plaintiff - Appellee*

v.

Lamont Marzolf

*Defendant - Appellant*

Josh Kirmer

*Defendant*

_____

Appeal from United States District Court
for the Western District of Arkansas - Fayetteville

_____

Submitted: April 13, 2021
Filed: August 16, 2021

_____

Before KELLY, GRASZ, and KOBES, Circuit Judges.

_____

GRASZ, Circuit Judge.

Arkansas police officer Lamont Marzolf challenges the district court's denial
of qualified immunity to him as to four 42 U.S.C. § 1983 claims.

Those claims arose on a dark, rainy night in Springdale. That evening, the police were conducting a gang-related stakeout in a residential neighborhood. The stakeout eventually turned into a car chase that ended with a car crash. The driver and three passengers fled on foot. The police knew that one of the suspects often carried a gun. Nearby, while setting up a perimeter, Officer Marzolf stopped and questioned two boys—ages twelve and fourteen—at gunpoint. According to Officer Marzolf, W.Y. and S.Y. matched a vague description of two of the fleeing suspects: they wore hoodies, and one was shorter than the other. Officer Marzolf detained them on his sergeant's orders. He held them for seven minutes until backup arrived. Even though they complied with his orders, Officer Marzolf forced them to lay on the ground. And when backup arrived, he handcuffed and frisked them. All this even though the boys' stepfather and mother identified them to Officer Marzolf at separate times during the encounter.

The issue before us in this interlocutory appeal is not whether Officer Marzolf could have done things differently when he stopped W.Y. and S.Y. Rather, the issue is whether Officer Marzolf violated the boys' clearly established constitutional rights. Under the governing precedent, we conclude he did not. And so, we reverse.

## I. Background[1]

In January 2018, the Springdale Police received a tip that a woman with outstanding arrest warrants was staying in the house of a suspected gang member. During a stakeout to find that woman, an officer saw multiple people leave in a Chevy Cobalt, including two men—one smaller than the other. Another officer tried to stop the Cobalt. But the driver fled and eventually crashed the car. Four people

---

[1]Because Officer Marzolf argues that the district court legally erred in its qualified immunity analysis, we "can simply take, as given, the facts that the district court assumed when it denied summary judgment for that (purely legal) reason." *Johnson v. Jones*, 515 U.S. 304, 319 (1995).

ran from the scene: two went south and two north. Dispatch instructed officers to set up a perimeter around the site to stop the fleeing suspects.

Officer Marzolf responded to the dispatch call. As he approached an intersection near the crash site with his blue lights flashing, dispatch told him that when the police last encountered one of the four fleeing suspects he had a gun.

Soon after, Officer Marzolf saw two people (later identified as W.Y. and S.Y.) walking slowly toward him within the perimeter wearing hoodies and light-colored pants. One was taller than the other. Officer Marzolf turned on his headlights and angled his car toward the boys. He stopped and said, "Hey, what are you guys doing?" W.Y., the taller and older boy, responded by speaking and pointing past Officer Marzolf. The dash cam video does not convey his response. Officer Marzolf then said, "Hey, stop, stop, turn away, turn away from me." The boys did so with their arms at their sides. Then, Officer Marzolf entered the video frame with his gun pointed at the boys.

Officer Marzolf then asked, "What are your names?" He next pulled out his flashlight and pointed it at the boys' backs. One of the boys said his name multiple times. Officer Marzolf confirmed the name and kept his gun trained on the boys.

Then, the boys' mother, Casondra Pollreis, walked up and said, "Officer, officer, may I have a word with you?" While she said more, her exact words are unclear from the recording. Officer Marzolf then spoke into his radio: "45 Springdale, I've got [W.Y.] in front of me, I've got two juvenile individuals, dark hoodies and pants." Sergeant Kirmer responded, "OK, detain both of those." After confirming with Officer Marzolf that one was taller and the other was short and skinny, Sergeant Kirmer repeated, "Hold on to them please."

Officer Marzolf walked up to the boys with his gun pointed at them and told them to get on the ground. They complied. He then said, "Put your hands out." They complied. Pollreis walked toward Officer Marzolf and asked what happened.

-3-

Officer Marzolf told her to step back multiple times. She said, "They're my boys." He then stepped toward her with his gun still pointed at the boys and said, "I am serious get back." He drew his taser, pointed it at her, and ordered her to go back to her house. She asked, "Are you serious? They're twelve and fourteen years old." Officer Marzolf responded, "And I'm looking for two kids about this age right now, so get back to your house." An upset Pollreis then exclaimed, "Oh, my god. You're OK guys, I promise."

Officer Marzolf continued to stand over the boys for nearly two minutes with his gun pointed at them. During those two minutes, he asked the boys for identification and requested backup.

The boys' stepfather then approached and said, "Officer . . . can I have a word with you?" Officer Marzolf declined. The stepfather stated, "Those are my kids," and Officer Marzolf responded, "OK." The stepfather explained, "We just left [Pollreis's] parents' right there. When you guys passed with your lights on, they were walking behind my car. I also have witnesses if you want me to call them." Officer Marzolf responded, "That's fine, I just need to find out who these kids are right now." The boys' stepfather stated their names.

Another officer, Adrian Ruiz, arrived at the scene. At the same time, W.Y. reached back to adjust his shirt or belt and Officer Marzolf yelled, "Hey, keep your hands out!" Both officers walked toward the boys with their guns pointed at them. While Officer Ruiz continued to point his gun at the boys, Officer Marzolf holstered his weapon and handcuffed W.Y. Officer Ruiz handcuffed S.Y. Officer Marzolf then told dispatch, "I've got black hoodies and khaki pants and jeans." Officer Ruiz said, "Black hoodie, and a white backpack . . . ."

Sergeant Franklin, the officer in charge, arrived next. He immediately asked the boys if they ran from the police. The boys said no and explained: "We were at our grandparents . . . and we just started walking home." When Sergeant Franklin asked their names, they told him.

Officer Marzolf then frisked W.Y. and searched his pant pockets for weapons. Sergeant Franklin asked Officer Marzolf if they were running. Officer Marzolf replied, "No, they were just walking, sir." Sergeant Franklin responded, "OK. So these guys probably aren't them?" And Officer Marzolf said, "Probably not. I mean we had both parents come out."

The boys' grandparents then walked up and identified the boys to the officers. At that time, Officer Ruiz searched S.Y.'s backpack. After speaking with the grandparents, Sergeant Franklin ordered the officers to remove the handcuffs and let the boys go. By then, around seven minutes had passed since Officer Marzolf first stopped the boys.

Pollreis sued Officer Marzolf and another officer. She asserted four § 1983 claims against Officer Marzolf on her boys' behalf: (1) illegal seizure; (2) illegal arrest and detention; (3) illegal search; and (4) excessive force. She also brought claims on her boys' behalf against another officer and claims on her own behalf against both officers. The officers moved for summary judgment, arguing that the district court should grant them qualified immunity because it was not clearly established that their actions violated the Constitution. The district court denied summary judgment on four of Pollreis's claims on behalf of her boys against Officer Marzolf for (1) prolonging an investigative detention; (2) illegally arresting the boys; (3) using excessive force against the boys; and (4) frisking W.Y. for weapons.[2] Officer Marzolf now challenges the denial of qualified immunity to him on those four claims.

## II.  Analysis

"Summary judgment is appropriate if the evidence, viewed in the light most favorable to [Pollreis] and giving [her] the benefit of all reasonable inferences,

---

[2]The district court dismissed all Pollreis's claims against the other officer. It also dismissed all her personal claims against Officer Marzolf.

shows there is no genuine issue of material fact." *Goffin v. Ashcraft*, 977 F.3d 687, 690–91 (8th Cir. 2020) (quoting *Morgan v. A.G. Edwards*, 486 F.3d 1034, 1039 (8th Cir. 2007)). "[A] district court's denial of summary judgment based on a public official's claim of qualified immunity may be appealed immediately." *Bearden v. Lemon*, 475 F.3d 926, 929 (8th Cir. 2007).

We review denials of qualified immunity de novo, *Rush v. Perryman*, 579 F.3d 908, 912 (8th Cir. 2009), but we may only address "purely legal [issues]: whether the facts alleged . . . support a claim of violation of clearly established law." *Wilson v. Lamp*, 901 F.3d 981, 985 (8th Cir. 2018) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 528 n.9 (1985)).

Qualified immunity "shields a government official from liability unless his conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Burns v. Eaton*, 752 F.3d 1136, 1139 (8th Cir. 2014) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). To defeat qualified immunity, Pollreis must prove that: "(1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation." *Howard v. Kansas City Police Dep't*, 570 F.3d 984, 988 (8th Cir. 2009).

"Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (cleaned up). We are "not to define clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).

## A. Investigative Detention

Officer Marzolf first argues that the district court erred in concluding that triable facts exist on whether reasonable suspicion supported the entire investigative detention.

The Fourth Amendment protects against "unreasonable . . . seizures." U.S. Const. amend IV. The Supreme Court has held that "the police can stop and briefly detain a person for investigative purposes if the officer has reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). "In making reasonable-suspicion determinations, reviewing courts 'must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing.'" *United States v. Martinez-Cortes*, 566 F.3d 767, 769 (8th Cir. 2009) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). An officer's observations must be viewed "as a whole, rather than as discrete and disconnected occurrences." *United States v. Poitier*, 818 F.2d 679, 683 (8th Cir. 1987).

"Factors that may reasonably lead an experienced officer to investigate include time of day or night, location of the suspect parties, and the parties' behavior when they become aware of the officer's presence." *United States v. Dawdy*, 46 F.3d 1427, 1429 (8th Cir. 1995). We have said before that "a person's temporal and geographic proximity to a crime scene, combined with a matching description of the suspect, can support a finding of reasonable suspicion." *United States v. Quinn*, 812 F.3d 694, 698 (8th Cir. 2016) (citing *United States v. Juvenile TK*, 134 F.3d 899, 903–04 (8th Cir. 1998)).

An investigative detention may start lawfully yet not stay that way. When an officer exceeds *Terry*'s scope, the investigative detention transforms into an arrest. *See United States v. Aquino*, 674 F.3d 918, 923–24 (8th Cir. 2012). "To establish an unreasonably prolonged detention, the [complaining party] must show that the

officer detained him beyond the amount of time otherwise justified by the purpose of the stop and did so without reasonable suspicion." *United States v. Donnelly*, 475 F.3d 946, 951–52 (8th Cir. 2007).

Here, the district court concluded that, while Officer Marzolf initially had the reasonable suspicion needed to stop the boys, the facts he discovered after the initial stop create a triable fact about whether Officer Marzolf's reasonable suspicion continued during the prolonged seizure. In support, the district court pointed to these facts: (1) the boys were not out of breath or acting suspiciously; (2) they complied with Officer Marzolf's commands during the encounter; (3) both parents identified the boys separately; (4) the stepfather gave a convincing alibi; and (5) the boys looked like the ages their parents said.

We do not see this as an unlawfully prolonged investigative stop. Consider the stop's specific purpose: to identify the boys and to determine if they were, in fact, two people fleeing from the crash. Even without learning any new suspicious facts during the encounter, Officer Marzolf was justified in taking the amount of time needed to accomplish those purposes. *See Donnelly*, 475 F.3d at 951–52.

Here, after Sergeant Kirmer ordered Officer Marzolf to detain the boys, Officer Marzolf reasonably chose to wait for backup to complete the stop's mission. Five undisputed facts, in particular, support this conclusion: (1) potential physical danger—Officer Marzolf had good reason to believe that one of the suspects was armed; (2) the location—the boys were on foot near where the four suspects had fled the car wreck; (3) the time—night; (4) the conditions—it was raining with low visibility; and (5) a matching description—the boys matched a vague description of two of the suspects. Given these facts, identifications from two people claiming (rightly in this case) to be the boys' parents did not lessen Officer Marzolf's

reasonable suspicion to the extent that he could not detain the boys until his backup arrived so that he could complete the stop's purposes.[3]

Thus, we conclude that the district court erred in holding that triable facts remain on whether Officer Marzolf unlawfully prolonged the investigative detention of the boys. We also conclude that Officer Marzolf should receive qualified immunity on the prolonged-investigative-detention claim.

## B. De Facto Arrest

We next ask whether the stop became a de facto arrest at any point. The district court concluded that a triable fact remains as to this question because Officer Marzolf took "intense" actions (e.g., used handcuffs) even after the boys complied with his commands.

"[A]n action tantamount to arrest has taken place if the officers' conduct is more intrusive than necessary for an investigative stop." *United States v. Raino*, 980 F.2d 1148, 1149 (8th Cir. 1992) (internal citation and quotation marks omitted). We have observed that this line "can be hazy." *Chestnut v. Wallace*, 947 F.3d 1085, 1088 (8th Cir. 2020). An investigative detention can become an arrest if it "lasts for an unreasonably long time or if officers use unreasonable force." *Waters v. Madson*, 921 F.3d 725, 736 (8th Cir. 2019). Thus, an initially reasonable investigative stop can become unreasonable if it was "excessively intrusive in its scope or manner of execution." *El-Ghazzawy v. Berthiaume*, 636 F.3d 452, 457 (8th Cir. 2011). We have provided several factors to consider in determining whether an investigative stop became an arrest:

---

[3]By the time the boys' grandparents also identified them, Sergeant Kirmer had arrived and taken charge. And he ordered the boys released seconds after the grandparents identified them. So, the additional grandparent-identification fact did not diminish Officer Marzolf's reasonable suspicion.

(1) the number of officers and police cars involved; (2) the nature of the crime and whether there is reason to believe the suspect might be armed; (3) the strength of the officers' articulable, objective suspicions; (4) the erratic behavior of or suspicious movements by the persons under observation; and (5) the need for immediate action by the officers and lack of opportunity for them to have made the stop in less threatening circumstances.

*Raino*, 980 F.2d at 1149–50. To use handcuffs during an investigative stop, "the Fourth Amendment requires some reasonable belief that the suspect is armed and dangerous or that the restraints are necessary for some other legitimate purpose[.]" *El-Ghazzawy*, 636 F.3d at 457 (quoting *Bennett v. City of Eastpointe*, 410 F.3d 810, 836 (6th Cir. 2005)). Also, "[i]t is well established . . . that when officers are presented with serious danger in the course of carrying out an investigative detention, they may brandish weapons or even constrain the suspect with handcuffs in order to control the scene and protect their safety." *United States v. Fisher*, 364 F.3d 970, 973 (8th Cir. 2004) (citations omitted).

For purposes of our analysis, we focus on when the stop was most likely to have transformed into an arrest: when Officer Marzolf put the boys in handcuffs. If the stop did not turn into an arrest when Officer Marzolf's actions were at their most intrusive, it follows that it did not turn into an arrest at all.

We have held that using handcuffs can transform an investigative stop into a de facto arrest, but does not always do so. For example, in *El-Ghazzawy*, we held that using handcuffs transformed the stop into a de facto arrest because (1) the officer had no indication that the man was dangerous, (2) the suspected crime did not involve a weapon, (3) the man did not act suspiciously, (4) the officer failed to conduct any investigation before handcuffing the suspect, and (5) there were no exigent circumstances. 636 F.3d at 457–58. But in *Waters*, we held that handcuffing and placing a non-compliant individual in a squad car for twenty minutes was not a de facto arrest. 921 F.3d at 738. More recently, in *Chestnut*, we held that handcuffing a mostly compliant individual for twenty minutes was not a de facto

arrest, even after police frisked the individual and found no weapons. 947 F.3d at 1088.

Here, the district court concluded that triable facts barred summary judgment on the illegal-arrest claim. While the district court recognized that the detention was significantly shorter than those in *Waters* and *Chestnut*, it noted that this interaction was more "intense" because the boys were handcuffed (like the other cases) *and* ordered to lie face down surrounded by officers. And, unlike *Waters*, the boys complied with all orders.

Ultimately, we disagree with the district court. The boys were handcuffed for less than two minutes here. This stands in stark contrast to *Waters* and *Chestnut*, where the handcuffing lasted ten times longer. 921 F.3d at 737; 947 F.3d at 1088. The *entire encounter* here lasted seven minutes, while the boys were handcuffed at most for two minutes. In addition to the short time frame, the video clearly shows that immediately before Officer Marzolf handcuffed and frisked W.Y., the boy moved his left hand behind his back and touched his waist. Considering that hand motion together with what Officer Marzolf heard before the encounter about one of the male suspects usually carrying a gun, he reasonably used handcuffs briefly "to control the scene and protect [officer] safety." *Fisher*, 364 F.3d at 973.

Unlike in *El-Ghazzawy*, where no facts indicated that the suspect was dangerous or had a weapon, here Officer Marzolf had two such indications: (1) W.Y.'s hand-to-waist movement; and (2) the tip that a male suspect usually carried a weapon. True, the boys were mostly compliant, unlike in *Waters* (handcuffing held not an arrest). *See* 921 F.3d at 737–38. But the individual in *Chestnut* (handcuffing also held not an arrest) was also mostly compliant as well. *See* 947 F.3d at 1088. The juxtaposition between *Waters* and *Chestnut* is a good reminder that compliance is only one factor, albeit an important one, in the totality-of-the-circumstances analysis.

-11-

Based on the totality of the circumstances, we conclude that the investigative detention did not become an arrest here because Officer Marzolf only used handcuffs briefly (under two minutes) when he had two indications that one of the boys may have been armed. Thus, Officer Marzolf is also entitled to qualified immunity on the de-facto-arrest claim.

## C. Frisk of W.Y.

The district court's conclusion that Officer Marzolf's frisk of W.Y. was unreasonable rested on its prior two conclusions that the investigative stop was unlawfully extended and had turned into an unlawful arrest before the frisk. Because we disagree with those earlier conclusions, we further conclude that Officer Marzolf's frisk of W.Y. was reasonable.

While executing an investigative stop, officers can "take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *United States v. Hensley*, 469 U.S. 221, 235 (1985). One such "step" is a frisk for weapons, which an officer may perform during an investigative stop as long as they have articulable suspicion that the person is armed and dangerous. *See Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993); *United States v. Davidson*, 808 F.3d 325, 329 (8th Cir. 2015). In making the reasonable-suspicion determination, we consider the totality of the circumstances known to the officer at the time. *See United States v. Menard*, 95 F.3d 9, 11–12 (8th Cir. 1996).

Here, during a lawful investigative stop, Officer Marzolf observed W.Y. reach for his waist seconds before he conducted the frisk. And, based on the information Officer Marzolf already knew, he expected that at least one of the suspects was armed. Thus, when Officer Marzolf frisked W.Y., the former had an articulable reasonable suspicion that the latter was armed and dangerous. *See Davidson*, 808 F.3d at 329.

We conclude that Officer Marzolf's frisk of W.Y. was therefore authorized to "protect [the officers'] personal safety and to maintain the status quo during the course of the stop." *Hensley*, 469 U.S. at 235. As a result, we further conclude that Officer Marzolf should receive qualified immunity on the unlawful-search claim.

### D. Excessive Force

Last, Officer Marzolf argues that the district court erred in concluding that a triable fact remains on whether he used excessive force against the boys by continuing to point his gun at them after they began complying with his commands. Up front, we acknowledge that these facts present a close question. But ultimately, we agree with Officer Marzolf.

An officer's use of force violates the Fourth Amendment if it was "objectively unreasonable." *Graham v. Connor*, 490 U.S. 386, 394–96 (1989). Objective unreasonableness is "judged from the perspective of a reasonable officer on the scene," in light of "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396; *see Perry v. Woodruff Sheriff Dep't*, 858 F.3d 1141, 1145 (8th Cir. 2017) (noting that we "rely on the perspective of a reasonable officer present at the scene rather than the '20/20 vision of hindsight'" (quoting *Carpenter v. Gage*, 686 F.3d 644, 649 (8th Cir. 2012))).

We have held that it is unreasonable to point a gun at a compliant suspect for an unreasonably long period of time after the police have taken control of the situation. *See Wilson*, 901 F.3d at 990–91 (holding that officers used excessive force when they continued to point their guns at Wilson and his minor son after frisking him, searching his truck, and realizing he was not the suspect they were looking for based on their own personal knowledge); *see also Rochell v. City of Springdale Police Dep't*, 768 F. App'x 588, 589 (8th Cir. 2019) (unpublished) (holding that an officer used excessive force when he pointed his gun at a suspect's head after the

-13-

suspect dropped his weapon, submitted to arrest, and no longer posed an immediate threat to officer safety).[4]  The district court relied on *Wilson* and *Rochell* to deny Officer Marzolf qualified immunity—concluding based on those cases that "the right not to have a gun pointed at a compliant suspect was clearly established by at least February 2016" in the Eighth Circuit.

More recently in *Clark v. Clark*, we discussed the factual contexts of *Wilson* and *Rochell*: "[Those cases] involve[d] incidents where guns were pointed at suspects for *unreasonably long periods of time, well after the police had taken control of the situation*." 926 F.3d 972, 979 (8th Cir. 2019) (emphasis added).  *Clark* distinguished its facts from *Wilson*'s and *Rochell*'s by pointing out that, even though the *Clark* suspect showed his hands to the officers, they were

> justified in believing the situation was not fully under control until [the suspect] had been removed from the vehicle, patted down, and restrained.  When [the suspect] stopped his vehicle, officers knew [he] had a weapon, were aware that he had been the only identified person present in an area where shots had reportedly been fired, and had reason to believe he might be a suspect attempting to evade capture.

*Id.*  Like in *Clark*, here Officer Marzolf pointed his gun at the boys *before* the situation was under control (e.g., suspects restrained, patted down, and definitively identified).  Officer Marzolf, who was initially all alone with the two suspects, used his gun during the encounter before he had secured and patted down the boys when he suspected the boys may be two of the suspects based on their (1) number—two;

---

[4]Officer Marzolf argues that a claim for excessive force requires more than a de minimis injury.  Not so.  We "held in *Chambers v. Pennycook*, 641 F.3d 898 (8th Cir. 2011), that it is possible for the use of excessive force to result in only a de minimis injury.  But we explained that the 'degree of injury' is still 'certainly relevant insofar as it tends to show the amount and type of force used.'" *Robinson v. Hawkins*, 937 F.3d 1128, 1136 n.3 (8th Cir. 2019) (cleaned up) (quoting *Chambers*, 641 F.3d at 906).  So, in our circuit, the degree of injury is relevant to the excessive-force inquiry, but there is no minimum-injury requirement.

(2) appearance—one shorter than the other; (3) proximity to the crime—within the police perimeter; and (4) the low visibility—night and raining. And as in *Clark*, Officer Marzolf knew that the suspects being sought might be armed and dangerous.

This case is more like *Clark* than either *Wilson* or *Rochell*. In *Wilson*, the officers continued to point their guns at Wilson and his minor son even after realizing he was not the suspect that they wanted based on their personal knowledge. 901 F.3d at 990. They also continued to point their weapons at Wilson after frisking him and searching his truck. *Id.* In *Rochell*, the officer pointed his gun behind a compliant suspect's ear and said, "I'll blow your f*****g brains out if you ever approach me like that again." 768 F. App'x at 591 (Colloton, J., concurring). We concluded in both *Wilson* and *Rochell* that the officers' gun pointing constituted excessive force. *Id.*; *Wilson*, 901 F.3d at 990.

Here, unlike in *Wilson*, Officer Marzolf lacked the personal knowledge to rule out the boys as suspects (despite their parents' attempts to identify them during the encounter), and he did *not* continue to point his gun at the boys after they were frisked. And unlike in *Rochell*, Officer Marzolf did not point his gun behind either boys' ear. Nor did he threaten to blow their brains out. We see this case as more like *Clark* because Officer Marzolf only pointed his gun at the boys before the situation was under control (e.g., suspects restrained, patted down, and definitively identified).

We conclude that Officer Marzolf did not use unreasonable force when he pointed his gun at the boys while he waited for backup and before the situation was under control. And we conclude that he should receive qualified immunity on the excessive force claim.

Because we conclude that Officer Marzolf did not violate the boys' constitutional rights during the encounter, we need not decide whether these rights were clearly established when the alleged violations occurred.

## III. Conclusion

Although it may be of little consolation to Pollreis and her children, it bears emphasizing that neither W.Y. nor S.Y. did anything wrong, nor anything deserving of such a harrowing experience. The boys simply happened onto the stage of a dangerous live drama being played out in their neighborhood because of criminals fleeing police nearby. W.Y. and S.Y. acted bravely, respectfully, and responsibly throughout the encounter, and their family would rightly be proud of them. Likewise, their family acted responsibly and respectfully during what would have undoubtedly been a frightening experience. In this situation, though, Officer Marzolf was doing his job protecting the people of Springdale from fleeing criminal suspects under challenging conditions.

For the reasons already stated, we reverse that part of the district court's order denying qualified immunity to Officer Marzolf on the four remaining claims against him and remand the case for the entry of an order granting summary judgment to him on these claims.

KELLY, Circuit Judge, dissenting.

Officer Marzolf may have been justified in his initial decision to stop W.Y. and S.Y. and even in his use of some force against them as he determined whether they posed a threat to his safety and the safety of others. But I disagree with the court's conclusion that at no point over the course of their detention did he violate their Fourth Amendment rights. I write separately because I believe that the stop escalated to an arrest without probable cause; that Officer Marzolf unlawfully searched W.Y.; and that he used excessive force by continuing to point his gun at W.Y. and S.Y. as they lay on the ground. I would therefore affirm the district court's ruling.

I.

The first issue Officer Marzolf raises on appeal is whether his detention of W.Y. and S.Y. violated their Fourth Amendment rights. The district court found that Officer Marzolf had reasonable suspicion to stop W.Y. and S.Y. when he first encountered them, and Pollreis has not challenged that conclusion on appeal. Because Officer Marzolf had reasonable suspicion that W.Y. and S.Y. had committed a crime, he was authorized to temporarily detain them to investigate his suspicions. See Illinois v. Wardlow, 528 U.S. 119, 123 (2000) ("[A]n officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot."). During a Terry stop, "officers should employ the least intrusive means of detention and investigation, in terms of scope and duration, that are reasonably necessary to achieve the purpose of the temporary seizure." United States v. Maltais, 403 F.3d 550, 556 (8th Cir. 2005) (cleaned up). "A Terry stop may become an arrest, requiring probable cause, if the stop lasts for an unreasonably long time or if [the] officer[] use[s] unreasonable force." United States v. Newell, 596 F.3d 876, 879 (8th Cir. 2010) (cleaned up); see also United States v. Raino, 980 F.2d 1148, 1149 (8th Cir. 1992) (explaining that when an officer's conduct "is more intrusive than necessary for an investigative stop, an "action tantamount to arrest has taken place" (cleaned up)).

Like the court, I see Officer Marzolf's decision to handcuff W.Y. and S.Y. as they lay face down on the ground as a turning point in the interaction. But I believe that the handcuffing escalated the stop into an arrest.

"[F]or the use of handcuffs during a Terry stop, the Fourth Amendment requires some reasonable belief that the suspect is armed and dangerous or that the restraints are necessary for some other legitimate purpose." El-Ghazzawy v. Berthiaume, 636 F.3d 452, 457 (8th Cir. 2011) (quoting Bennett v. City of Eastpointe, 410 F.3d 810, 836 (6th Cir. 2005)). Whether the use of handcuffs turns a stop into an arrest is "evaluated on the facts of each case." Id. (quoting Bennett,

-17-

410 F.3d at 836). We have repeatedly emphasized, however, that an officer may handcuff a suspect during a Terry stop only if he has a reasonable belief that doing so is necessary to preserve the status quo and ensure officer safety. See id. at 459 (concluding that an officer violated the Fourth Amendment where her "conduct was not reasonably necessary to protect her personal safety and to maintain the status quo during the investigatory stop"); United States v. Martinez, 462 F.3d 903, 907 (8th Cir. 2006) ("Placing [the suspect] in handcuffs was a reasonable response to the situation in order to protect the officers' personal safety and maintain the status quo. As such, the use of handcuffs did not convert this Terry stop into an arrest."); Waters v. Madson, 921 F.3d 725, 738 (8th Cir. 2019) (holding that officers who handcuffed a suspect remained within the bounds of a Terry stop when the suspect's "unpredictability, evasiveness, argumentative demeanor, refusal to disobey [sic] legitimate officer commands, and the size difference between [the suspect] and the officers" gave officers reason to believe "they needed to handcuff [the suspect] and place him in the squad car to preserve the status quo"). If an officer cannot "point to specific facts" indicating an "objective safety concern[]," her use of handcuffs is not permitted under Terry. El-Ghazzawy, 636 F.3d at 457–59 (holding that an officer's use of handcuffs escalated a stop to an arrest when the officer was given no information to suggest that the suspect was armed or dangerous; the crime she believed he committed was not a dangerous one; the suspect exhibited no erratic or suspicious behavior prior to being handcuffed; and less forceful alternatives were available).

In my view, Officer Marzolf's decision to handcuff W.Y. (and, soon after, S.Y.) was not justified by an "objective safety concern" or need to preserve order. At that point, W.Y. and S.Y. had been lying on their stomachs with their hands by their sides for minutes. Both had complied with all of Officer Marzolf's commands and answered all of his questions. As in El-Ghazzawy, and unlike in Waters, nothing W.Y. or S.Y. did from the moment Officer Marzolf first encountered them was "erratic or suspicious," nor did their behavior suggest they were dangerous or likely to harm Officer Marzolf. Moreover, by the time Officer Marzolf began handcuffing W.Y., Officer Ruiz had arrived on the scene, and other officers were pulling up as

-18-

well. This means Officer Marzolf was no longer alone and outnumbered, as he had been when he initiated the stop. And, like the officer in El-Ghazzawy, Officer Marzolf conducted barely any investigation into whether W.Y. and S.Y. were the suspects he was pursuing or whether they presented a safety threat before handcuffing them. Under these circumstances, a reasonable officer in Officer Marzolf's position would not have felt the need to use handcuffs to maintain the status quo or protect his safety.

Officer Marzolf argues, and the court emphasizes, that an important distinction between this situation and that of the officer in El-Ghazzawy is that Officer Marzolf had been informed that there were fleeing, possibly armed suspects in the area and reasonably believed that W.Y. and S.Y. were those suspects. But while the report of armed suspects in the area may have supported Officer Marzolf's initial decision to stop W.Y. and S.Y., his reason to believe that they were the suspects he was looking for had diminished by the time he handcuffed them. The boys were walking when he first saw them, and when he employed handcuffs he had observed that they did not seem out of breath, as might have been expected had they been fleeing a crime scene on foot. Cf. Bell v. Neukirch, 979 F.3d 594, 604 (8th Cir. 2020) ("Bell's relatively fresh appearance is noticeably inconsistent with what a reasonably prudent officer would expect to observe after running a mile in about seven minutes."). W.Y. and S.Y.'s quiet cooperation from the beginning of the encounter also would have seemed inconsistent with the behavior of people who, moments earlier, ran from a car crash to evade the police. Further, both Pollreis and the boys' stepfather independently confirmed the name W.Y. had provided to Officer Marzolf earlier in the encounter and informed Officer Marzolf that the boys were their adolescent sons. This additional information may not have completely eliminated all suspicion, but a reasonable officer would have had cause to question whether S.Y. and W.Y. were the armed suspects. Cf. Duffie v. City of Lincoln, 834 F.3d 877, 883 (8th Cir. 2016) ("Officers may not turn a blind eye to facts that undermine reasonable suspicion."). And just as the grounds for reasonable suspicion were dissipating, W.Y. and S.Y.'s behavior during the stop indicated that they were cooperative and did not present any danger to Officer Marzolf. Considering all the

-19-

information available at the time, a reasonable officer would not have concluded that handcuffs were necessary to protect his safety or maintain the status quo. Accordingly, when Officer Marzolf handcuffed W.Y. the stop became an arrest.

"The distinction [between detention and arrest] matters under the Fourth Amendment" because "[a]n arrest is valid only if there is probable cause to believe that a suspect has committed or is about to commit a crime." Chestnut v. Wallace, 947 F.3d 1085, 1088 (8th Cir. 2020); see also United States v. Aquino, 674 F.3d 918, 924 (8th Cir. 2012) ("[A] Terry stop that becomes an arrest must be supported by probable cause."). "A law enforcement officer has probable cause when the totality of the circumstances at the time of the arrest are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense." Gilmore v. City of Minneapolis, 837 F.3d 827, 832 (8th Cir. 2016). The existence of probable cause is determined based on the facts available to the arresting officers "at the moment [an] arrest [i]s made," United States v. Rivera, 370 F.3d 730, 733 (8th Cir. 2004), and from "the standpoint of an objectively reasonable police officer," District of Columbia v. Wesby, 138 S. Ct. 577, 586 (2018). Unlike a Terry stop, "[a]n arrest must be supported by more than a reasonable, articulable suspicion that a person committed a crime. There must be a 'fair probability' or 'substantial chance' that the person seized has committed an offense." Bell, 979 F.3d at 603 (cleaned up).

Officer Marzolf did not have probable cause to arrest W.Y. and S.Y. Even in the initial moments of the encounter, the only evidence that W.Y. and S.Y. had committed a crime was that they were walking in the same neighborhood as fleeing suspects and seemed to match the suspects' general description (male, wearing hoodies, and different heights). But "the fact that [they] fit a general description . . . in isolation [was] insufficient to justify [their] arrest." United States v. Martin, 28 F.3d 742, 745 (8th Cir. 1994). And, as discussed above, Officer Marzolf had even less reason to believe W.Y. and S.Y. were the suspects in question "at the moment the arrest was made." Rivera, 370 F.3d at 733. Yet even when presented with exculpatory information, Officer Marzolf conducted no further investigation before he put them in handcuffs. See Bell, 979 F.3d at 609 ("[A]n officer must not disregard

plainly exculpatory evidence, even if substantial inculpatory evidence suggests that probable cause exists. Officers also have a duty to conduct a reasonably thorough investigation before arresting a suspect." (cleaned up)). Considering the information available at the time, a reasonable officer in Officer Marzolf's position would not have believed that there was a "fair probability" or "substantial chance" W.Y. and S.Y. had committed a crime.

Because he arrested them without probable cause, Officer Marzolf violated W.Y. and S.Y.'s Fourth Amendment right to be free from unlawful seizure.

## II.

After handcuffing W.Y. and S.Y., Officer Marzolf frisked W.Y. Because W.Y. was, in my view, under arrest at that time, Officer Marzolf's actions should be considered a search incident to arrest. See United States v. Haynes, 958 F.3d 709, 715 (8th Cir. 2020). Whether the search of W.Y. was authorized under the Fourth Amendment "thus turns on whether there was probable cause for [W.Y.'s] arrest." United States v. Chartier, 772 F.3d 539, 545 (8th Cir. 2014). Since Officer Marzolf did not have probable cause, the frisk also violated W.Y.'s rights under the Fourth Amendment.

## III.

The last issue is whether Officer Marzolf used excessive force against W.Y. and S.Y. by pointing his gun at them. "The Fourth Amendment protects citizens from being seized through excessive force by law enforcement officers." Mettler v. Whitledge, 165 F.3d 1197, 1202 (8th Cir. 1999). We determine whether a seizure involved excessive force by applying an "objective reasonableness standard." Parrish v. Dingman, 912 F.3d 464, 467 (8th Cir. 2019). As the court explains, "[o]bjective unreasonableness is judged from the perspective of a reasonable officer on the scene, in light of the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to

the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Wilson v. Lamp, 901 F.3d 981, 989 (8th Cir. 2018) (cleaned up).

This circuit has recognized that an officer who points a gun at a suspect may, under certain circumstances, violate that person's right to be free from excessive force. See id. at 989–90; Clark v. Clark, 926 F.3d 972, 979 (8th Cir. 2019). An officer may point his gun at a suspect when the officer has reason to believe the suspect is armed and is "justified in believing the situation [is] not fully under control." Clark, 926 F.3d at 979. But this use of force is not permissible when the suspect is "not threatening and not resisting," Lamp, 901 F.3d at 990, and "no longer poses an immediate threat to the safety of officers or others," Rochell v. City of Springdale Police Dep't, 768 F. App'x 588, 589 (8th Cir. 2019) (per curiam). In Lamp, for example, we concluded that officers were justified in drawing their weapons as they approached a car that they reasonably believed was driven by an armed suspect. 901 F.3d at 990. But after they realized that the driver was not the suspect they were looking for, observed him complying with their commands, and patted him down, their "continuous drawing and pointing of weapons constitute[d] excessive force." Id. Similarly, in Rochell, we held that "a police officer uses excessive force by pointing his service weapon at the head of a suspect who has dropped his weapon, has submitted to arrest, and no longer poses an immediate threat to the safety of officers or others." 768 F. App'x at 589.

Here, as in Lamp, Officer Marzolf may not have used excessive force when he first approached W.Y. and S.Y. with his gun drawn. Under the circumstances he initially faced, Officer Marzolf was likely "justified in believing the situation was not fully under control." Clark, 926 F.3d at 979. But that belief was no longer justified as the stop went on and W.Y. and S.Y. continued to obey all of Officer Marzolf's commands, including to lie down on the ground. See Rochell, 768 F. App'x at 591 (Colloton, J., concurring) (characterizing Lamp as holding that "pointing a firearm at a compliant suspect [is] unreasonable"). Once W.Y. and S.Y. were lying on their stomachs with their arms by their sides, as Officer Marzolf

-22-

instructed (and especially once other police cars began to arrive on the scene), Officer Marzolf no longer had reason to believe that W.Y. and S.Y. "pose[d] an immediate threat to the safety of officers or others." Id. at 589. Because he continued to point his weapon at W.Y. and S.Y. past this point, he violated their Fourth Amendment rights.

The court disagrees, comparing this case to Clark, where we found no use of excessive force. In Clark, police officers stopped a driver whom they knew had a gun, whom they "had reason to believe . . . might be a suspect attempting to evade capture," and whom they earlier had seen making a u-turn to avoid them. 926 F.3d at 976, 979. Though the driver "signaled compliance by putting his hands out the driver's side window," we concluded that "pointing a firearm at [him] for a few seconds while removing him from his vehicle did not constitute excessive force." Id. at 979–80. At least two important differences distinguish this case from Clark. First, though the driver in Clark "signaled compliance" by showing his hands, he did so without being asked, meaning that he had not demonstrated that he would actually cooperate with the officers' orders. See id. at 976. Since he had been attempting to evade the police moments earlier, the officers had cause to be wary of his seeming compliance. Here, on the other hand, W.Y. and S.Y. uniformly obeyed Officer Marzolf's commands from the first moment of the stop, and he had no reason to believe they would not continue to do so. Second, the officers in Clark faced a suspect in the driver's seat of a vehicle, and they trained their guns at him only until he safely got out of the car. Both this court and the Supreme Court have observed that "traffic stops are especially fraught with danger to police officers"—a danger that is minimized "if the officers routinely exercise unquestioned command of the situation." Arizona v. Johnson, 555 U.S. 323, 330 (2009) (cleaned up); accord United States v. Warren, 984 F.3d 1301, 1305 (8th Cir. 2021). Until the driver exited the vehicle, these dangers were present for the officers in Clark—particularly as they knew for certain that he was armed and had difficulty "see[ing] exactly what [he] was doing inside the car." Clark, 926 F.3d at 976. Officer Marzolf did not face the same potential danger from two pedestrians lying on their stomachs in full view in front of him.

-23-

As the court observes, Officer Marzolf's conduct may not have been as extreme as that of the officers in Lamp and Rochell. But the Fourth Amendment does not proscribe only extreme conduct. A reasonable officer in the same position would have realized a few minutes into the stop that W.Y. and S.Y. were "not threatening and not resisting," Lamp, 901 F.3d at 990, and did not "pose[] an immediate threat to the safety of officers or others," Rochell, 768 F. App'x at 589. Because the threat W.Y. and S.Y. appeared to pose is the central consideration in determining whether Officer Marzolf's use of his weapon constituted excessive force, I would conclude that it did.

IV.

In the court's view, on the night of January 8, 2018, Officer Marzolf was simply "doing his job protecting the people of Springdale from fleeing criminal suspects under challenging conditions." I am sympathetic to the difficult, uncertain position Officer Marzolf was in when he encountered W.Y. and S.Y. But that initial difficulty did not allow him to "ignore changing circumstances and information that emerge[d] once [he] arriv[ed] on scene," Neal v. Ficcadenti, 895 F.3d 576, 581 (8th Cir. 2018), and it did not authorize him to handcuff and continue to point his weapon at W.Y. and S.Y. once it was clear they were compliant, nonthreatening, and likely not the suspects he was looking for. Because I believe Officer Marzolf's conduct over the course of W.Y. and S.Y.'s detention violated their Fourth Amendment rights, I respectfully dissent.

_____