# United States Court of Appeals

### For the Eighth Circuit

———————————————

No. 24-2875

———————————————

Raven W. Bartz

*Plaintiff - Appellant*

v.

City of Minneapolis; Officer Conan Hickey, in his individual and official capacities

*Defendants - Appellees*

——————————

Appeal from United States District Court
for the District of Minnesota

——————————

Submitted: May 13, 2025
Filed: March 18, 2026

——————————

Before BENTON, KELLY, and GRASZ, Circuit Judges.

——————————

GRASZ, Circuit Judge.

Raven Bartz argues Officer Conan Hickey shot her in the head with a projectile fired from a less-lethal 40mm launcher while she was in a crowd of protesters in Minneapolis after the death of George Floyd. Bartz sued Officer Hickey and the City of Minneapolis under 42 U.S.C. § 1983 and *Monell v. Department of Social Services*, 436 U.S. 658 (1978), arguing among other claims

that Officer Hickey unreasonably seized her in violation of the Fourth Amendment of the U.S. Constitution. The district court[1] granted summary judgment for the defendants on Bartz's Fourth Amendment claim, holding that Officer Hickey did not violate the Fourth Amendment and was entitled to qualified immunity even if he did. The district court declined to exercise supplemental jurisdiction over Bartz's state battery claim. Bartz appeals, and we affirm.

## I. Background

In May 2020, protests and riots erupted in Minneapolis for several days and nights following the death of George Floyd on May 25. Though some protested peacefully, others burned businesses and looted stores. Officers testified that objects such as rocks and bricks were hurled at them and fireworks and Molotov cocktails were hurled at their precinct headquarters. On May 28, rioters stormed the police department's Third Precinct headquarters and set it on fire, forcing those officers protecting it to evacuate. The Governor of Minnesota activated the Minnesota National Guard and declared a peacetime emergency. The next day, the Governor of Minnesota and the Mayor of Minneapolis imposed a nighttime curfew in the city, beginning at 8:00 p.m. The Governor's curfew order recognized that "[d]estructive and dangerous activity" had continued since the peacetime emergency and stated the State "must restore peace and safety immediately." The mayoral proclamation stated that as a result of the "civil disturbance, public safety personnel, residents, and visitors have been and remain at risk of significant injury and death and the potential for further civil unrest or disturbance is to such an extent that extraordinary measures must be taken to protect the public health, safety, and welfare." The Mayor further explained that "much of the destruction and violence" occurred "under the cover of darkness."

---

[1]The Honorable Nancy E. Brasel, United States District Judge for the District of Minnesota.

Despite the curfew, about 2,000 individuals gathered at 9:00 p.m. outside the police department's Fifth Precinct headquarters for the fourth night of protests-turned-riots. Officers gathered to protect it. As shown by the video footage of that night submitted by the City and Officer Hickey in support of their motion for summary judgment, which included footage of the area surrounding the police's Fifth Precinct headquarters, aerial surveillance of different parts of the city, and police body camera footage, fires raged and exploded while people congregated in the streets and moved traffic barriers. By midnight, officers had cleared some of the area near the Fifth Precinct. As Bartz acknowledges in her brief, "[l]aw enforcement warned protesters in the area that if they continued to 'obstruct, resist, and/or interfere with peace officers'" they would be arrested. As revealed by the police body camera video footage on which she relies, around midnight police announced to those in the area that they were in violation of unlawful assembly and were ordered to disperse peaceably from the area immediately. Still, protestors remained in the general area while several businesses continued to burn.

Around this time, Bartz and some friends joined protesters near the Fifth Precinct. Bartz testified in her deposition that while they walked to their destination, "[t]here were buildings on fire within a block." Nevertheless, they continued walking until they stopped in a crowd of about 100 or more people confronting a line of police officers, including Officer Hickey of the Minneapolis Police Department. Bartz testified they walked over halfway through the crowd until they were about thirty to forty feet from the officers, with five rows of people in front of them.[2] Bartz testified the group she joined was protesting peacefully and that she did not witness anyone throwing objects at officers, setting off fireworks, shining lasers in officers' eyes, or burning any buildings.

At 12:30 a.m., as individuals joined the crowd in front of the line of officers, an officer threw a "blast ball" — a device that causes a loud, bright explosion and

[2]Officer Hickey's expert analyst opined the nearest protester from the officers was 90 feet away and Bartz was approximately 132 feet away.

can contain a chemical irritant — at the crowd.  After seeing the explosion, Bartz turned to run.  Around this time, Officer Hickey and another officer aimed their less-lethal 40mm launchers toward the crowd and fired projectiles.  While running, Bartz felt a sharp hit to the back of her head.  Bartz alleges it was Officer Hickey's 40mm projectile that hit her.  She continued running for about twenty to thirty feet and then walked before eventually sitting down.  After passing out, Bartz then went to the hospital where she received Tylenol and staples for the laceration in her head.  After running tests, hospital staff determined she did not have a concussion.  But since that night, Bartz claims she experiences headaches, emotional distress, and memory loss.

Bartz sued Officer Hickey and the City of Minneapolis, asserting a Fourth Amendment excessive force claim, a *Monell* claim, and a state law battery claim.[3] The district court granted the defendants' summary judgment motion on the federal claims against Officer Hickey, determining he did not seize Bartz for purposes of the Fourth Amendment and that he was entitled to qualified immunity even if he did seize her.  The district court also held the *Monell* claim against the City failed without an underlying constitutional violation, and it declined to exercise supplemental jurisdiction over the remaining state law claim.  Bartz now appeals arguing (1) Officer Hickey violated her clearly established Fourth Amendment right against unreasonable seizure; (2) the City is liable under *Monell*; and (3) the defendants are not entitled to summary judgment on her state law battery claim.

## II.  Analysis

We review de novo a district court's grant of summary judgment based on qualified immunity.  *De Mian v. City of St. Louis*, 86 F.4th 1179, 1182 (8th Cir. 2023).  "Summary judgment is appropriate when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Id.* (quoting Fed. R. Civ. P. 56(a)).  Though we view the facts most

---

[3]Bartz also asserted First Amendment retaliation claims against Officer Hickey and the City, but the parties stipulated to their dismissal.

favorably to Bartz, "we may rely on video evidence found in the record where that video evidence 'blatantly contradicts' the nonmoving party's characterization of the facts." *Brown v. City of St. Louis*, 40 F.4th 895, 899 (8th Cir. 2022) (brackets omitted) (quoting *Steed ex rel. Steed v. Mo. State Highway Patrol*, 2 F.4th 767, 770 (8th Cir. 2021)). And we "may affirm the grant of summary judgment 'on any ground supported by the record.'" *Pollreis v. Marzolf*, 66 F.4th 726, 729 (8th Cir. 2023) (quoting *Adam & Eve Jonesboro, LLC v. Perrin*, 933 F.3d 951, 958 (8th Cir. 2019)), *cert. denied*, 144 S. Ct. 2580 (2024).

To overcome qualified immunity, Bartz "must show that the officer[] violated a constitutional right, and that the unlawfulness of [his] conduct was clearly established at the time." *Dundon v. Kirchmeier*, 85 F.4th 1250, 1255 (8th Cir. 2023). "For a right to be clearly established, the 'contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

Bartz argues Officer Hickey violated her Fourth Amendment rights. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. This right includes protection against unreasonable seizures involving the use of excessive force. *See Graham v. Connor*, 490 U.S. 386, 395 (1989); *Burbridge v. City of St. Louis*, 2 F.4th 774, 780 (8th Cir. 2021). To establish an excessive force claim under the Fourth Amendment, "the claimant must demonstrate a seizure occurred and the seizure was unreasonable." *McCoy v. City of Monticello*, 342 F.3d 842, 846–47 (8th Cir. 2003). We assume, without deciding, that a seizure occurred here, and we resolve this case by answering whether Officer Hickey's use of force was reasonable.

We evaluate the use of force based on an objective reasonableness standard, undertaking "a fact-intensive inquiry." *McDaniel v. Neal*, 44 F.4th 1085, 1090–91 (8th Cir. 2022). The officer's use of force is "judged from the perspective of a reasonable officer on the scene," considering "the facts and circumstances of each

particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Pollreis v. Marzolf*, 9 F.4th 737, 747 (8th Cir. 2021) (quoting *Graham*, 490 U.S. at 396). In our evaluation, we balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Burbridge*, 2 F.4th at 780 (quoting *White v. Jackson*, 865 F.3d 1064, 1074 (8th Cir. 2017)). And we are mindful that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.

It is true "we have held time and again that, if a person is not suspected of a serious crime, is not threatening anyone, and is neither fleeing nor resisting arrest, then it is unreasonable for an officer to use more than *de minimis* force against him." *Mitchell v. Kirchmeier*, 28 F.4th 888, 898 (8th Cir. 2022). But our balancing of an individual's Fourth Amendment interests and the countervailing governmental interests at stake does not take place in a vacuum.

As the Supreme Court recently reiterated, our "inquiry into the reasonableness of police force requires analyzing the 'totality of the circumstances.'" *Barnes v. Felix*, 145 S. Ct. 1353, 1358 (2025) (quoting *County of Los Angeles v. Mendez*, 581 U.S. 420, 427–28 (2017); *Tennessee v. Garner*, 471 U.S. 1, 9 (1985)). "[T]he situation at the precise time of the shooting will often be what matters most," but "earlier facts and circumstances may bear on how a reasonable officer would have understood and responded to later ones." *Id.* "The history of the interaction, as well as other past circumstances known to the officer, thus may inform the reasonableness of the use of force." *Id.* Relevant factors we may consider include "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; . . . the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting."

*Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). Here, although some of the protesters were protesting peacefully, the situation confronting Officer Hickey was a far cry from "a peaceful scene interrupted by rubber bullets and tear-gas." *Quraishi v. St. Charles County*, 986 F.3d 831, 836 (8th Cir. 2021) (concluding an officer did not have arguable probable cause to use tear-gas based on a belief that those reporting on a protest were committing crimes).

Bartz and other protesters were defying a citywide curfew during a declared peacetime emergency while parts of the city burned and rioters caused violence and destruction. Viewing the video footage in the record of that night, the circumstances resemble a war-torn city more than a peaceful protest. *See Brown*, 40 F.4th at 897, 902–03 (relying on video evidence submitted by officers in support of their motion for summary judgment depicting the circumstances at issue). Just the night before, rioters overtook and burned down the police department's Third Precinct, which Officer Hickey protected until the officers' emergency evacuation. *See Barnes*, 145 S. Ct. at 1358 (explaining that "earlier facts and circumstances may bear on how a reasonable officer would have understood and responded to later ones"). As explained by the curfew announcement issued by the Governor, "[d]estructive and dangerous activity" had continued since the declaration of a peacetime emergency and the State needed to "restore peace and safety immediately." And as the Mayor's curfew announcement stated, "public safety personnel, residents, and visitors" were "at risk of significant injury and death and the potential for further civil unrest or disturbance" was so likely that "extraordinary measures" needed to be taken "to protect the public health, safety, and welfare." From the perspective of a reasonable officer on the ground, this night was taking shape like the night before. The circumstances revealed the "severity of the security problem at issue" and the "threat reasonably perceived by the officer." *Kingsley*, 576 U.S. at 397. And yet Bartz violated curfew and ventured into the turmoil while police sought to protect the city and the public. Even if well-intentioned, during this chaos, Bartz and the other protesters posed a threat to the officers and the public safety. *Graham*, 490 U.S. at 396 (explaining the test of reasonableness requires "careful attention to the . . . immediate threat to the safety of the officers or others").

Nevertheless, Bartz argues that firing a round from a 40mm launcher at the head of a person constitutes use of deadly force. As support, she primarily relies on *Marks v. Bauer*, 107 F.4th 840 (8th Cir. 2024), *vacated*, 1145 S. Ct. 2733 (2025) (mem.), *remanded to*, 166 F.4th 1121 (8th Cir. 2026).[4] *Marks* is distinguishable from the situation here. Unlike the officer in *Marks*, Officer Hickey's 40mm projectile did not hit a protester "in the face from approximately five to ten feet away." *Marks*, 166 F.4th at 1121 (footnote omitted). And in *Marks*, the projectile hit the protester in the eye, "rupturing his right eyeball, fracturing his eye socket," "causing a traumatic brain injury," and making the protester "legally blind in that eye." *Id.* at 1126. Though Bartz testified the projectile that hit her caused symptoms after the incident (such as losing consciousness, seizing, headaches, emotional distress, and memory loss), Bartz was able to run and walk away from the protest just after the use of force, hospital staff later determined she did not have a concussion, and she received staples and Tylenol at the hospital. Thus, her injuries are also less severe than those in *Marks*. *See Kingsley*, 576 U.S. at 397 (noting the court may consider "the extent of the plaintiff's injury" when determining the reasonableness of the use of force).

Ultimately, under "circumstances that [were] tense, uncertain, and rapidly evolving," the government had a strong interest in using force to bring the situation under control. *See Graham*, 490 U.S. at 397. "Where law enforcement was trying to control a rapidly escalating situation, we have held that the use of force was not unreasonable." *Jackson v. Stair*, 944 F.3d 704, 711 (8th Cir. 2019). The video footage in the record reveals the intensity of the situation Officer Hickey faced that night protecting the Fifth Precinct. *See Brown*, 40 F.4th at 897, 902–03 (relying on video evidence submitted by officers in support of their motion for summary judgment depicting the circumstances at issue). Given the chaotic and threatening

---

[4]The Supreme Court vacated and remanded our decision in *Marks I* "for further consideration in light of" its recent opinion, *Barnes v. Felix*, 605 U.S. 73 (2025). *Marks*, 145 S. Ct. 2733. On remand in *Marks II*, we applied *Barnes*'s "moment-of-threat" rule, but this did not impact our analysis as to whether the officer's use of force was deadly. *See* 166 F.4th at 1125, 1129.

conditions unfolding after nights of protests-turned-into-riots, including the threat to police headquarters, first responders, and the public, a reasonable officer could conclude those defying the curfew and confronting the officers that night presented a serious threat that needed to be brought under control. We therefore conclude Officer Hickey's firing of a 40mm projectile was reasonable. *See White*, 865 F.3d at 1079 (concluding officer's use of non-lethal projectiles was reasonable when the officer "could have concluded that [the plaintiff] had been a part of the violent crowd, that his advances toward the skirmish line posed a threat to officer safety, and that he disobeyed officer orders to stop"). Officer Hickey is thus entitled to summary judgment.

Having determined Bartz's excessive force claim under the Fourth Amendment fails, we turn to her *Monell* and state law claims. She argues the Minneapolis Police Department had a widespread custom of using unreasonable force and that this alleged custom caused the violation of Bartz's constitutional rights. But as explained, Officer Hickey's conduct did not violate the Constitution, so Bartz's *Monell* claim must fail absent an underlying constitutional violation. *See Whitworth v. Kling*, 90 F.4th 1215, 1218 (8th Cir. 2024). As to her state law battery claim, she argues the City and Officer Hickey are not entitled to summary judgment. But the district court declined to exercise its supplemental jurisdiction over this claim, and Bartz does not argue it abused its discretion by doing so. Thus, we will not disturb the district court's decision to decline exercising jurisdiction. *See De Mian*, 86 F.4th at 1183.

### III. Conclusion

For the foregoing reasons, we affirm.

KELLY, Circuit Judge, dissenting.

I would conclude that a reasonable jury could find Bartz was seized for purposes of the Fourth Amendment when she was hit with a 40mm projectile.

Because the district court found Bartz was not seized and did not reach the question of whether the force used against her was reasonable, I would remand to the district court for further analysis rather than address that question in the first instance. For this reason, I respectfully dissent.

In an excessive force claim, the "threshold question" is whether a seizure occurred. Dundon v. Kirchmeier, 85 F.4th 1250, 1255 (8th Cir. 2023). As the Supreme Court has explained, "a seizure requires the use of force with intent to restrain." Torres v. Madrid, 592 U.S. 306, 317 (2021) (citation modified). And "the application of physical force to the body of a person with intent to restrain is a seizure even if the person does not submit and is not subdued." Id. at 325. In determining whether there was an intent to restrain, neither accidental force nor "force intentionally applied for some other purpose" will qualify; the "appropriate inquiry is whether the challenged conduct *objectively* manifests an intent to restrain[.]" Id. at 317. In line with this guidance, we "have recognized a potential distinction between force used with intent to apprehend and force used with intent to disperse or repel." Dundon, 85 F.4th at 1256; see also Keup v. Sarpy County, 159 F.4th 533, 538–39 (8th Cir. 2025) (stating that "what matters is whether the record demonstrates that the officer applied force to restrain or to disperse" before holding that an officer did not objectively manifest an intent to restrain because the officer "fired to disperse, not to seize" (citations modified)).

Viewing the evidence in the light most favorable to Bartz, a reasonable jury could find that she was seized. Bartz presented evidence that munitions of the kind Officer Hickey employed here are designed and used to incapacitate, not to disperse. Minneapolis Police Department (MPD) policy states that "Officers shall not deploy 40mm launchers for crowd management purposes." MPD policy further defines 40mm less-lethal rounds as "[d]irect fire round[s] used in situations where maximum deliverable energy is *desired* for [] *incapacitation*[,]" (emphasis added), and accordingly allows them to be deployed when "*incapacitation . . . is desired*." (emphasis added). In sum, as a matter of MPD policy, 40mm less-lethal rounds are

-10-

prohibited for the purpose of dispersal and may only be used when an officer intends to incapacitate.

The particular circumstances under which Hickey fired the 40mm round at Bartz also suggest Hickey did not use the force to disperse. The record shows that, at some point during the protest, an officer threw a blast ball—an action that no one seems to dispute was an attempt at dispersal. In response to the blast ball, many people—including Bartz—turned to run. A couple seconds later, Hickey fired his 40mm launcher, striking Bartz in the back of the head. When he shot her, Bartz was already running away. She was not moving toward him or the line of officers nor did she remain in place. A reasonable jury could find that Hickey's use of his 40mm launcher, after the use of a blast ball intended for dispersal, was intended to incapacitate her.

And "the amount of force remains pertinent in assessing the objective intent to restrain." Torres, 592 U.S. at 317. A lesser amount of force, such as "[a] tap on the shoulder[,] . . . will rarely exhibit" an objective intent to restrain. Id. Conversely, as the amount of force increases, so does the likelihood that an officer objectively intended to restrain. "The degree of injury [a plaintiff suffered] is certainly relevant insofar as it tends to show the amount and type of force used." Chambers v. Pennycook, 641 F.3d 898, 906 (8th Cir. 2011) (citations omitted). And "[w]e think it enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result." Brower v. County of Inyo, 489 U.S. 593, 599 (1989)). After being struck in the head by the projectile, Bartz lost consciousness, had a seizure, and required hospital care. At that point, Bartz was actually stopped. Moreover, MPD policy addresses "Target Areas" when using 40mm launchers:

> Officers shall be aware that the delivery of the 40mm impact projectiles to certain parts of the human body can cause grievous injury . . . or possible death. Areas susceptible to death or possible severe injury are the head, neck, throat and chest . . . . Unless deadly force is justified,

officers should avoid the delivery of 40mm impact projectiles to any of the above-described areas.

As the district court found, a reasonable juror could conclude that it was Hickey who struck Bartz, and it is undisputed that Bartz was struck in the head. Hickey testified that he did not believe he struck any unintended person with 40mm munition that night. And he could recall only one instance in which he struck a person on an unintended part of their body—and that person was not Bartz. Together with the MPD policy, this evidence would allow a reasonable jury to find that Hickey used an amount of force that objectively reflects an intent to restrain.[5]

This evidence as a whole, and viewed in the light most favorable to Bartz, would permit a reasonable juror to find that Hickey had an objective intent to restrain when he fired 40mm munition at Bartz's head. I would remand to the district court for further proceedings.

_____

---

[5]The record also includes evidence that officers at the protest planned to make mass arrests. Bartz submitted officer statements made after the fact that indicated there had been a plan to "try to make a mass arrest" of "all the protesters" in the same area where Bartz was protesting. She also relied on the City of Minneapolis's official position on the very protest she participated in: "SWAT officers were asked not to make arrests and leave that to the strike teams and some of the mobile field officers." Hickey was a member of the strike team that night. While the officers' subjective intent is not at issue, "[i]ntent matters . . . to the extent it 'has been conveyed' to others." Hight v. Williams, 164 F.4th 672, 675–76 (8th Cir. 2026) (quoting Irish v. McNamara, 108 F.4th 715, 719 (8th Cir. 2024)).